**Alfred J. STEWART, Plaintiff-Appellant,**

v.

**M.M. & P. PENSION PLAN,
Defendant-Appellee.**

No. 77–2166.

United States Court of Appeals,
Ninth Circuit.

Nov. 21, 1979.

Charles B. Bateman, Graham & James, San Francisco, Cal., for plaintiff-appellant.

Norman Leonard, Gladstein, Leonard, Patsey & Andersen, San Francisco, Cal., on brief; Richard Ernst, San Francisco, Cal., for defendant-appellee.

Before TRASK and ANDERSON, Circuit Judges, and WYATT,* District Judge.

WYATT, District Judge:

This appeal is by Alfred J. Stewart from a judgment of the United States District Court for the Northern District of California dismissing his action on the merits. The opinion below is reported at 432 F.Supp. 742. We conclude that dismissal of the action was proper but that it should have been for want of jurisdiction and not on the merits.

1.

Stewart has been for some years and is now a licensed deck officer for ships, having been licensed as a master (46 U.S.C. § 226). (While nowhere averred in the pleadings, this seems to have been stipulated by the parties.) We understand that a deck officer is in distinction to an engineer officer and that the term "licensed deck officer" includes a master.

International Organization of Masters, Mates & Pilots (MMP) is a labor organization which for some time has been the collective bargaining agent for its member licensed deck officers. Apparently Stewart is a member of MMP.

Pacific Maritime Association (PMA) is an association of employers in the steamship business on the Pacific coast. It has acted as collective bargaining representative for its member employers.

M.M. & P. Pension Plan (the Plan) is a series of provisions contained in an "Agreement and Declaration of Trust Establishing the M.M. & P. Pension Plan", dated as of October 17, 1973, executed by eight trustees, by MMP, and by a number of employers, parties to separate collective bargaining agreements with MMP. As will be seen, the Plan is an outgrowth of predecessor pension arrangements dating back to August 1, 1950, all made under collective bargaining agreements.

The action was commenced by the filing of a complaint on August 23, 1973. The defendants named were (a) "Trustees, Masters, Mates & Pilots Pension Plan", (b) "Stephen P. Maher, as administrator", (c) "Masters, Mates & Pilots Union", and (d) "Pacific Maritime Association." There is no affidavit or other proof of service of a summons and the complaint. Some sort of service on one or more of the named defendants was attempted by mail. There were two motions to quash, one by PMA and the other by "the defendants above named (other than Pacific Maritime Association)". The latter motion made the point (among others) that: "There is no identification of the Trustees . . ." and "it cannot be ascertained if the defendants herein (other than Pacific Maritime Association) are the 'Trustees' or the 'Plan' . . . ." The reaction for Stewart was to admit "that some of these objections are valid and, accordingly, asks leave to file an amended complaint." On consent, an order was filed on November 12, granting such leave.

A "first amended complaint" (referred to hereafter as "the amended complaint") was filed November 21, 1973. This named as defendants (a) "Masters, Mates & Pilots Pension Plan", (b) "International Organization of Masters, Mates & Pilots" and (c) "Pacific Maritime Association".

It will be seen that plaintiff, his attention drawn to the uncertainty whether he was suing the Trustees or the Plan, made it clear in the amended complaint that he was suing the Plan and not the Trustees.

Jurisdiction in the District Court was claimed under Section 301 of the Labor Management Relations Act, 1947 (sometimes called the "Taft-Hartley Act") (29 U.S.C. § 141 and following; Section 301 of the Act is § 185 of 29 U.S.C.). There was also mention in the amended complaint of 28 U.S.C. § 1337. There was no mention of Section 302 of the Act (29 U.S.C. § 186).

---

* Honorable Inzer B. Wyatt, United States District Judge, Southern District of New York, sitting by designation.

After a sketchy introduction, it was averred in the amended complaint that "defendants", in violation of the pension regulations, had refused to allow Stewart "to accrue pension credit past twenty years of employment." While not specifically averred, it appeared from the amended complaint that Stewart was continuing his employment as a master covered by the Plan.

The amended complaint asserted that Stewart was being deprived of benefits in violation of an agreement between PMA, an employer, and MMP, a labor organization representing employees in an industry affecting commerce.

The amended complaint contained this averment:

### XVI

That an actual justiciable controversy exists between plaintiff and defendants relating to plaintiff's rights arising from his membership in the International Organization of Masters, Mates & Pilots and the MMP Pension Trust Declaration and Regulations. That because of the decision of the Board of Trustees to limit the number of years that plaintiff can accrue employment pension credit, plaintiff is being denied rights and benefits entitled to him and others in his situation in that he is being denied pension benefits for the current five year period in excess of his twenty years of employment.

The prayer for relief was for a declaration of the rights of the parties and for a decree enjoining defendants "from penalizing plaintiff in the enjoyment of pension rights upon his *subsequent* voluntary retirement, or impairing his vested rights therein" (emphasis supplied).

There is an affidavit of service of the summons and of the amended complaint on PMA and on MMP. There is no affidavit of service on the Plan, nor on the Trustees; as to the Trustees, the want of proof of service is to be expected since they are not made defendants.

Appearances were filed as follows: for PMA, Mr. Ernst; for MMP, Mr. Leonard's law firm; and for "M.M. & P. Pension Plan," Mr. Ernst and Mr. Leonard.

Answers were filed for PMA and for MMP.

Mr. Ernst and Mr. Leonard filed an answer for "MMP Pension Plan, sued under the name 'Masters, Mates & Pilots Pension Plan', and on and for itself alone." This answer admitted that "the cause of action, if it had support in the facts, would be within the original jurisdiction" of the District Court. At the same time, the answer denied the averment in paragraph XVI of the amended complaint of the existence of a justiciable controversy.

By order on consent, filed July 11, 1974, the action was dismissed against MMP and PMA, leaving it to continue against the Plan as the only defendant.

The trial took place before Judge Orrick without a jury on July 14, 1976. There was no testimony. A stipulation of facts between the parties was submitted. Without objection, exhibits for Stewart numbered 1 through 18 and for the Plan numbered 1001 through 1011 were received in evidence. On this record, the trial court then set a briefing schedule. Oral argument was heard on September 8, 1976. At that argument the court referred to cross motions for summary judgment. These must have been oral and not stenographically recorded; there are no written motions for summary judgment in the record. In any event, Judge Orrick on February 4, 1977 filed his opinion, granting on the merits the motion of the Plan for summary judgment and denying the motion of Stewart for summary judgment.

The opinion shows that the District Court had the mistaken belief that the Trustees were the defendants and were defending. This belief could easily have been induced by the form of the caption employed by counsel; the first defendant named in their caption is "Trustees, Masters, Mates & Pilots Pension Plan", evidently because this was done in the complaint filed to commence the action.

It was argued for defendant to the Court below, but not here, that the issues were not "ripe for adjudication" (432 F.Supp. at 746), meaning that there was no case or controversy in the constitutional sense. Their submission in this regard was summarized as follows in the opinion below: "They argue that plaintiff, now age 55, may die without retiring, the Plan may be changed before he retires, or plaintiff may change his type of employment, such that the issues before the Court are hypothetical or abstract." (432 F.Supp. at 746) For the defendant, the decision in *Lugo v. Employees Retirement Fund, etc.*, 529 F.2d 251 (2d Cir. 1976), was urged as persuasive. The District Court rejected the argument and found the cited decision to be "inapposite". In so doing, we believe the District Court was in error.

2.

Stewart was born on December 2, 1921; he will thus be 58 years old on December 2 of this year. He went to sea as a licensed deck officer beginning in 1942.

An agreement and declaration of trust was made, as of August 1, 1950, between MMP and the various employers having collective bargaining agreements with MMP. This instrument established the "MM&P Pension and Welfare Plan" and the "MM&P Pension and Welfare Fund", both to be for the benefit of the licensed deck officers employed under the collective bargaining agreements. Contributions to the Fund were to be made by the employers. The Fund (also the Plan) was to be administered by Trustees, half appointed by the employers and half by MMP. The Trustees were given authority to determine all questions as to what benefits to pay, as to coverage, and as to eligibility for benefits.

Under date of September 20, 1955 the Trustees executed the M.M. & P. Pension Trust Declaration and thereby established the M.M. & P. Pension Trust. At the same time, the Trustees adopted M.M. & P. Pension Regulations, which were thereafter from time to time amended.

On July 15, 1960, Stewart left employment covered by the Plan. Thereafter, on May 5, 1962, while working at a job not covered by the Plan, he was severely injured. In 1963 he was found totally and permanently not fit for duty and was obliged to surrender his license as a master.

The pension regulations of the Trustees in effect in 1963 provided in their Article II, among other things, for retirement on a Disability Pension if a member at any age before 65 (normal retirement age) became permanently and totally disabled and if he then had at least 15 years of pension credits. At that time, for a normal pension a member was required to be 65 years old and to have 20 years of pension credit, but no accrual of pension credit beyond 20 years was permitted; the benefit could not be increased beyond that payable for 20 years pension credit. At that time, it was possible at age 60 to obtain an early retirement pension if an employee member had 15 years or more pension credit but not 20 years pension credit.

In October 1963 Stewart applied for retirement on a Disability Pension. It was found by the Trustees that Stewart was eligible for this benefit and effective November 1, 1963, he began to receive a Disability Pension under the Plan.

At this time in 1963, and at all times before and since, the pension regulations provided that a pensioner might return to his old work in employment covered by the Plan and might "subsequently retire again on a pension under this Plan. However, he shall not be entitled to any higher benefit amount than that originally established." This meant that if a pensioner returned to covered employment, he could not accrue further pension credit and increase his pension benefit on a second retirement. The regulations required, moreover, that if a pensioner returned to covered employment, notice to the Trustees must be given and their permission secured. Failure to give such notice and receive such permission could result in permanent disqualification for pension benefits.

Stewart had specific, personal, written notice of these conditions and so acknowledged over his signature.

780

As the war in Viet Nam more and more engaged the resources of this country, importantly in respect of shipping, there was pressure on retired deck officers to come out of retirement and resume work. The Trustees did not wish to discourage such re-employment and seem to have freely granted permission to do so. Moreover, in 1965 retired pensioners were notified in writing that they could resume employment as deck officers during the national emergency and "subsequently retire again on a pension under this plan" and that, in so doing, they would suffer no penalty except loss of pension payments during the time they were re-employed, provided they notified the Trustees and received permission beforehand. The notice made it clear, however, that any retired pensioner who resumed employment, "upon subsequent retirement", would not be entitled "to any higher benefit than originally established" —put another way, retired pensioners who resumed employment would not be given additional pension credits so as to increase their pension benefits when, as, and if they retired a second time. Such a notice was sent to Stewart who acknowledged its receipt and his understanding of it on November 15, 1965.

On August 25, 1966, evidently influenced by the need for ships officers in the Viet Nam effort, the Trustees adopted as part of the pension regulations a schedule, designated Article II–A, for higher benefits for "pensions becoming effective on and after June 16, 1968." Members who retired after June 16, 1968, were permitted to accrue pension credit under Article II–A in excess of 20 years and obtain a higher pension benefit thereby. For those who retired *before* June 16, 1968, Article II continued to be applicable and the maximum pension credit in their case was 20 years. The effect of the adoption of Article II–A was to encourage deck officers to continue in active service beyond June 16, 1968, rather than retiring before then; since Article II–A allowed pension credit to continue to accrue beyond 20 years, it tended to encourage deck officers to continue in active service.

At the same time, the Trustees voted that members who retired before June 16, 1968, with fewer than 20 years pension credit and who returned to covered employment, could accrue additional pension credit up to a maximum of 20 years.

The question soon arose, later to be the basis for this action by Stewart, whether a member who retired before June 16, 1968, who returned from retirement to covered employment, and who retired the second time after June 16, 1968, was entitled to the higher benefit in Article II–A or was governed by Article II and limited to 20 years of pension credit.

On December 16, 1966, the Trustees voted in favor of an interpretation of Article II and Article II–A of the Pension Regulations that "pensions becoming effective on and after June 16, 1968" means pensions on retirement for the *first* time on and after June 16, 1968, and thus that the higher benefit provisions of Article II–A do "not apply to men who return to covered employment from the Pension Rolls."

By some miracle of modern medicine, Stewart recovered from his disabling injury. On July 31, 1968, he was found fit for duty; his license was returned to him. On August 8, 1968, Stewart went to sea again, sailing as a master in covered employment. Evidently he knew at that time how the pension regulations, as then in effect and as interpreted by the Trustees, affected him. In a letter to the Administrator of the Plan, he wrote on August 19, 1968: "It is my understanding that I can continue to build time to 20 years and must appeal to the Trustees to build beyond 20 years."

When he returned to sea, Stewart did not ask for nor receive the approval of the Trustees to do so. He did notify the Plan, however, and in turn he was advised that, with the approval of the Trustees, he could return to covered employment, that he could accrue additional pension credit but only to a maximum of 20 years, and that with pension credit of 20 years he could retire on a normal pension.

On August 21, 1969, the Trustees approved the return of Stewart from retirement to covered employment.

Stewart then made several attempts to persuade the Trustees that he should be able to accrue pension credit beyond the 20-year maximum and thus increase his pension benefit when he retires a second time.

Under date of October 1, 1970, Stewart petitioned the Trustees to "lift" in his case the 20-year limit for pension credit applicable to those who retired the first time before June 16, 1968. He recognized that under the pension regulations he was limited to pension credit for 20 years because he first retired before June 16, 1968.

Under date of October 16, 1970, advice was sent to Stewart that the Trustees had denied his petition.

Under date of October 27, 1970, Stewart appealed again to the Trustees to reverse their decision and allow him to accrue pension credit beyond the 20-year limit of the pension regulations. The Trustees considered this appeal at a meeting on April 22, 1971, and resolved as to Stewart "that his request to accrue pension credit in excess of 20 years be denied in accordance with the Rules and Regulations of the Plan."

The action was commenced on August 23, 1973.

While the action was pending, Stewart asked for reconsideration by the Trustees of his situation. This was done. On December 4, 1975, Stewart, with his counsel, appeared before the Trustees at a meeting; counsel to the Plan were also present. The appeal to the Trustees was renewed, that Stewart be allowed to accrue pension credit in excess of 20 years as permitted by Article II–A of the pension regulations applicable to those who retire for the first time after June 16, 1968. The Trustees had theretofore consistently taken the position, beginning as far back as 1966 and known to Stewart at the least from that time (before he ever resumed covered employment), that those who retired and who later resumed covered employment could not, when, as,

and if they retired a second time, receive higher pension benefits than those benefits "originally established" when they first retired.

The request by Stewart for a reconsideration of the matter by the Trustees, which led to the December 4, 1975, meeting, was prompted by changes in the personnel holding the principal offices in MMP. These changes resulted in changes in the Trustees appointed by the union. Stewart believed that the change in Trustees might produce a change in their attitude toward the further accrual of pension credit by him during his continuing employment. This belief proved to be incorrect. The Trustees reconsidered the matter but determined again that Stewart was limited to 20 years of pension credit.

Thereafter, the trial took place, the opinion of Judge Orrick was filed, and the judgment entered from which this appeal is taken.

3.

It is highly doubtful, to say the least, that there was any defendant in the court below and equally doubtful that there is any appellee here. The Plan is not a legal entity, neither an individual nor partnership nor corporation; it is an abstract concept created by the October 17, 1973, Agreement and Declaration of Trust and earlier by a similar instrument or instruments. The Plan is thus incapable of suing or of being sued.

The District Court mistakenly believed that the Trustees were defendants and were defending. The amended complaint, however, does not name the Trustees as defendants, nor did they appear and answer. It is true that the caption of the judgment names "Trustees, Masters, Mates & Pilots Pension Plan, et al." as "Defendants", that the Trustees are recited as having been among "the remaining defendants", and that the judgment recites that it is in favor of "the Trustees". The form of the judgment is approved by Mr. Ernst and Mr. Leonard as "Attorneys for Defendant", and undoubtedly Mr. Ernst and Mr. Leonard represent the Trustees.

It may well be that the Trustees would be estopped to deny that they were parties to the action. We need not reach this question of jurisdiction over parties because there was clearly no jurisdiction over the claim as presented by Stewart.

4.

By Article III, Section 1, of the Constitution the judicial power of Federal courts is limited to "cases" and "controversies". No universally accepted definition of these terms has been formulated but certain characteristics, it is agreed, must be present: the dispute must be immediate, concrete, real, substantial. "A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

It was at one time ruled that an action for a declaratory judgment "is not a case or controversy within the meaning of Article III of the Constitution." *Willing v. Chicago Auditorium*, 277 U.S. 274, 289, 48 S.Ct. 507, 509, 72 L.Ed. 880 (1928; Brandeis, J.)

The Federal Declaratory Judgments Act, now embodied as 28 U.S.C. §§ 2201 and 2202, was passed in 1934. The Supreme Court, noting that this Act by its terms was limited to "a case of actual controversy", found that the Act "is operative only in respect to controversies which are such in the constitutional sense" and therefore was within the power of Congress. *Aetna Life Ins. Co. v. Haworth*, above cited, 300 U.S. at 240, 57 S.Ct. at 463.

■ Whenever a declaratory judgment is sought in a federal court, there must be an "actual controversy" before there can be jurisdiction. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient

*immediacy* and *reality* to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) (emphasis supplied).

The importance of "immediacy" and "reality" is illustrated by *Swedlow, Inc. v. Rohm & Haas Co.*, 455 F.2d 884 (9th Cir. 1972). Swedlow had a patent for casting plastic sheets. Rohm & Haas was in the process of building a new plant in Kentucky. Swedlow commenced an action based on averments that the plant being built "will employ the inventions claimed in these patents and will infringe the same when placed in operation." Declaratory and injunctive relief were sought. This Court affirmed dismissal of the action for want of jurisdiction, there being no "actual controversy." This Court adopted the opinion of the District Court, in relevant part as follows (455 F.2d at 885–6):

The Declaratory Judgments Act provides a remedy "in a case of actual controversy . . . ." Here, the plaintiff does not allege that there is a present or past infringement of his patents, but seeks only a declaration that defendant's acts "threaten" infringement.

■ In reality this complaint seeks an advisory opinion that if and when defendant completes the plant now under construction, assuming there are no material changes in the intervening period, the present acts of the defendant not only threaten, but in fact constitute an infringement of plaintiff's patents.

\*　　\*　　\*　　\*　　\*　　\*

At this point in time defendant's plant has progressed only to the stage where the floor and shell of the building are in place. Allowing the plaintiff to maintain this action now in California for alleged threats of future infringement in Kentucky is *too remote and unduly speculative.*

This Court went on to review the cases cited for appellant and, with one possible exception, found (455 F.2d at 886; emphasis supplied) that "in every cited case in which

an action for a declaratory judgment was permitted, an existing controversy had been manifested by specific acts of alleged infringement or an *immediate* capability and intent to produce an allegedly infringing item." The Court then declared that "[n]o such actual or *imminent* infringement" was involved in Swedlow's case (455 F.2d at 886; emphasis supplied); jurisdiction was therefore lacking.

A case from the Second Circuit, relied on by defendant below, is on its facts somewhat like the case at bar. Lugo was a member of a union and a beneficiary under a pension plan. At age 49 or 50 he left his last employment in the industry and, according to his complaint, applied (a) for Disability Benefits and (b) for Standard Retirement Benefits. He was denied Disability Benefits on a finding that he was not in fact disabled. He was denied Standard Retirement Benefits (1) because he was not employed 90 months in the 10 years before his application, and (2) because he was not 60 years old. The District Court gave judgment for the defendants on the merits as to both benefits claimed; apparently, the District Court doubted at first that the claim as to standard retirement benefits was a constitutional case or controversy, but he ended up deciding all claims on the merits. The Court of Appeals affirmed the judgment for defendants but, as to the standard retirement claims, affirmed for want of jurisdiction rather than on the merits. *Lugo v. Employees Retirement Fund*, 529 F.2d 251 (2d Cir. 1976). The Court in relevant part said (529 F.2d at 257–58):

> We turn now to plaintiff's claim regarding standard retirement benefits. At the trial below, Judge Bartels initially indicated that he found this claim unripe, and for that reason excluded certain evidence offered by plaintiff relating to it. In his final decision, however, the judge disposed of the claim on the merits, ruling that the regulation challenged by plaintiff was reasonable and not a violation of the Taft-Hartley Act. We believe the judge's initial reaction was correct and that the dispute between Lugo and the Fund is not ripe for adjudication.

Plaintiff attacks the provision of the plan that requires an applicant for standard retirement benefits to have worked 90 months in the industry within the 10 years immediately preceding his application in order to be eligible.

\* \* \* \* \* \*

There is, however, another rule of eligibility which excludes Lugo. Before an employee can apply for a standard retirement pension, he must have reached age 60. The plaintiff specifically stated at trial, on more than one occasion, that he does not challenge the validity of this rule. Lugo was about 49 when he allegedly applied for pension benefits, and is only 53 now. He is thus not entitled to receive a retirement pension for a reason entirely independent of the 90/10 rule he seeks to challenge.

We believe that this case, in which plaintiff argues that a regulation that might affect him at some future time is invalid because it conflicts with a federal statute, may usefully be analogized to a challenge to an administrative regulation on the ground that it conflicts with statutory or constitutional provisions. After a lengthy discussion of the Supreme Court's decision regarding the ripeness for adjudication of such challenges, Professor Davis concludes that "An issue is normally ripe for judicial determination when interests of the plaintiff are in fact subjected to or imminently threatened with substantial injury." 3 Davis Administrative Law Treatise § 21.10, at 200 (1958), and at 700 (Supp.1970). *See Abbott Laboratories v. Gardner*, 347 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). This test essentially restates in more concrete terms the standard for declaratory judgments announced by the Supreme Court in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), . . . : "Basically, the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and re-

ality to warrant the issuance of a declaratory judgment."

We do not believe that Lugo can meet this test. The possibility, or even, if such it is, the certainty that the Fund will invoke the 90/10 rule that Lugo claims is illegal to deny his application for a retirement pension at age 60 causes him no injury now, nor is he imminently threatened with such injury. The interest he asks us to defend has little "immediacy and reality."

Of course, there are situations in which a case may be ripe for declaratory relief before the challenged regulation is actually applied. . . .

In this case, Lugo does not allege that uncertainty as to whether he will be eligible for a pension at age 60 has any effect on his present behavior or condition.

\*   \*   \*   \*   \*   \*

However, plaintiff specifically disclaimed at trial any attack on the 60-year rule, and both the complaint and the record show that insofar as plaintiff does attack the combination of the two rules, rather than the 90/10 rule alone, he argues only that their interaction prevents early vesting of pension rights, which would be payable at some later date, not that they prevent him from getting his pension payments now. Thus, no matter how we reasonably view the plaintiff's claim to a standard retirement pension, it is at best a claim that when, seven years from now, plaintiff is old enough to be entitled to apply for such benefits, the trustees will deny his application on the basis of the 90/10 rule, which he claims is illegal. Such a claim is not ripe for adjudication.

The Second Circuit did not there use the words "case" or "controversy" or "jurisdiction" but as can be seen in the cited section of the administrative law treatise by Professor Davis, "ripeness for review" and "ripe for adjudication" are simply other ways to refer to the constitutional problem of case or controversy. For example, in the cited section of the Davis treatise (at page 207) he says:

The main responsibility for fashioning the law of ripeness is that of the courts, for the reasonable limits of the constitutional terms "case" and "controversy" are clearly wide enough to leave the courts a free hand.

Judge Orrick found that the *Lugo* decision was "inapposite" because Lugo, although he had applied for a standard retirement benefit, had not reached eligible retirement age, whereas Stewart by now has accrued 20 years of pension credit and is eligible to retire, either under Article II of the pension regulations (as amended) or under Article II–A. We do not believe that this distinction is significant. What makes the issue in the case at bar uncertain and remote is not that Stewart is ineligible to retire, but that he has neither. averred nor shown that he intends to retire and apply for retirement benefits until some unspecified time in the future.

5.

■ It seems clear from principle and precedent that Stewart did not present a case or controversy within the jurisdiction of the District Court. He has been in active service continuously for the past 11 years; he is now at age 58 and, so far as appears, will be in active service indefinitely. He did not aver that he wanted to retire or would retire, no matter how this action were decided. Either under Article II or under Article II–A, Stewart could retire now, but, in either case, at an income from pension benefits greatly reduced from that earned in active employment. There is nowhere a suggestion that he is interested in retirement at any time soon; indeed, his complaint, filed six years ago, did not ask for any injunction effective upon issuance, but only for an injunction against any "penalizing" by defendants "upon his *subsequent* voluntary retirement" (emphasis supplied).

There is no vested interest in any member in any benefits under the Plan, or otherwise. There is a specific "no vesting" provision in the pension regulations and an equally specific provision in the agreement and declaration of trust. If Stewart should

die before retiring a second time, he will lose all possibility of any further benefits under the Plan.

No one is denying any benefit now to Stewart, nor is anyone in any way presently causing him any injury. The past and present Trustees have simply said that if, as, and when he does retire, they propose to apply Article II in determining the amount of his benefits.

Any number of things can, and doubtless will, happen between now and the future date of Stewart's retirement and these may well affect that event. The Plan may be amended in ways not now able to be foreseen. By the agreement and declaration of trust, the Trustees are given virtually unlimited power of amendment. Stewart may change from covered employment before he retires; in some circumstances the regulations provide for loss or cancellation of pension credit.

The composition of the Trustees changes from time to time; such changes in 1975 caused Stewart then to ask for reconsideration of his arguments. Similar changes in the future may lead to a change in the attitude presently taken.

In any event, for a case or controversy in the constitutional sense, there must be an issue which is not remote and hypothetical but which is real and present. The problem submitted to the court below was not a case or controversy in the constitutional sense. In essence, what Stewart sought was an advisory opinion for possible use in the future when, as, and if he retires for the second time.

VACATED and REMANDED for entry of judgment of dismissal for want of jurisdiction of the subject matter.