**EXCESS AND CASUALTY REINSU-RANCE ASSOCIATION,**
Plaintiff-Appellee,

v.

**INSURANCE COMMISSIONER OF the STATE OF CALIFORNIA, as liquidator of Signal Insurance Company and Imperial Insurance Company, Defendant-Appellee,**

and

Insurance Department of the State of Florida, as ancillary receiver of Signal Insurance Company and Imperial Insurance Company; Florida Insurance Guaranty Association, Incorporated, Defendants-Appellants.

Nos. 79–3315, 79–3321.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 9, 1981.

Decided Sept. 14, 1981.

Klinger & Leevan, Los Angeles, Cal., for defendants-appellants.

Mark E. Field, Los Angeles, Cal., for plaintiff-appellee.

Edmond B. Mamer, Dep. Atty. Gen., Los Angeles, Cal., for Insurance Commissioner of California.

John M. McNatt, Jr., and Paul S. Leevan, Mathews, Osborne, Enrlich, McNatt, Gobleman & Cobb, Jacksonville, Fla., for Florida Insurance Guaranty.

Charles W. Havens, III, Washington, D.C., for Reinsurance Assn. of America.

Peter M. Appleton, Tyre & Kamins, Los Angeles, Cal., for the State of Florida.

Wayne D. Wilson, Wilson, Elser, Edelman & Dicker, Los Angeles, Cal., for Dep. Atty. Gen. for State of Nevada.

Kenneth W. Clausen, Los Angeles, Cal., for Calif. Insurance Guaranty Assn.

Before TUTTLE,* CHOY and KENNEDY, Circuit Judges.

CHOY, Circuit Judge:

This case, which is one of first impression in this circuit, calls upon us to determine who should receive reinsurance proceeds upon the insolvency of a reinsured company. We affirm the judgment below, which found that the statutory receiver was the appropriate recipient of such proceeds.

## I. Introduction

Reinsurance[1] is a special form of insurance obtained by insurance companies to help spread the burden of indemnification. A reinsurance company typically contracts with an insurance company to cover a specified portion of the insurance company's obligation to indemnify a policyholder in the event of a valid claim. This excess insurance, as it is called, enables the insurance companies to write more policies than their reserves would otherwise sustain since its guarantees the ability to pay a part of all claims. The reinsurance contract is not with the insured/policyholder. When a valid claim is made, the insurance company pays the first level insured, and the reinsurance company pays the insurance company. The reinsurance company's obligation is to the insurance company, and the insurance company vis-a-vis the reinsurer is thus the insured, or more appropriately the "reinsured."

Insurance guaranty associations provide insolvency insurance for insurance companies. Their role is somewhat analogous to that of the Federal Deposit Insurance Corporation in the banking industry. While the rules of the various associations vary, generally they are authorized by state statute and funded by the insurance companies doing business in that state.[2] The guaranty

---

* The Honorable Elbert P. Tuttle, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. We refer the reader desiring more familiarity with insurance concepts to 13A J. Appleman, Insurance Law and Practice, ch. 278 (1976); J. Olson, *Reinsurers' Liability to the Insolvent Re-*

insured, 41 Notre Dame Law 13 (1965); K. Thompson, Reinsurance (4th ed. 1966).

2. *See, e. g.*, National Association of Insurance Commissioners Insurance Guaranty Association Model Bill and Model Plan of Operation.

associations assume the obligations of an insolvent insurance company, generally providing defense and indemnification for policyholders. A guaranty association's rules may provide for a deductible amount which it will not cover. The function of the guaranty association is to protect insureds in the extraordinary event of insurance company insolvency. Reinsurance payments, on the other hand, are received in the ordinary course of insurance company operations.

State insurance commissioners or departments are charged with regulation of the insurance industry within the state. If an insurance company becomes insolvent, the state insurance commissioner is typically designated by statute as receiver or trustee to distribute the remaining funds of the company according to statutory priority. Thus while a guaranty association guarantees payment only to policyholders, the insurance commissioner liquidates the assets of the insolvent insurance company and distributes funds to all creditors, in order of priority.

## II. *Facts*

Having introduced these general concepts, we now outline the facts in this case. Signal Insurance Company (hereinafter "Signal"), a domiciliary of California, issued medical malpractice insurance policies, some of which covered Florida residents. In 1972, Signal entered into reinsurance contracts with Excess and Casualty Reinsurance Association ("Excess") to cover excess losses on its policies. Under one such policy, Signal was called upon to defend and indemnify a Florida physician in a malpractice action. Signal defended this claim until January 10, 1978, when it was adjudicated insolvent. The Florida Insurance Guaranty Association ("FIGA") then assumed Signal's obligations to defend. FIGA settled and paid the claim and notified Excess that it expected to receive reinsurance proceeds related to the policy under which FIGA had assumed Signal's obligations.

Signal was the subject of insolvency proceedings in California, and of ancillary proceedings in Florida. The Insurance Commissioner of the State of California ("California Commissioner"), California statutory liquidator and receiver of the insolvent companies, demanded that all reinsurance proceeds be paid to it. The Insurance Department of the State of Florida ("Florida Department"), which was appointed ancillary receiver of Signal by a Florida court, also demanded direct payment from Excess.

Faced with these competing claims, and anticipating additional claimants, Excess instituted interpleader proceedings in the district court to relieve it of its obligations under its reinsurance contract with Signal. Excess deposited $29,668.22 in reinsurance proceeds arising from the Florida claim with the court.

The district court refused to allow discovery, and on the basis of memoranda and exhibits submitted by the parties, it awarded the fund deposited by Excess to the California Commissioner. The district court based its order on the reinsurance contract, on California law, and on the ground that the California Commissioner as receiver could most efficiently distribute the reinsurance proceeds to the respective claimants. The court noted that the various claimants were free to approach the receiver in distribution proceedings with any claims against the insolvent companies. Excess was awarded fees from the deposited fund, and the remaining sum was ordered paid to the California Commissioner. Excess was then discharged from the action. The claims of the other defendants— FIGA, the California Insurance Guarantee Association ("CIGA"), and the Florida Department—were denied. While the defendants were not enjoined from bringing further action against Excess, the court noted that "the parties have fully litigated the issue of entitlement to the proceeds, and that all claimants therefore are subject to the res judicata effects of the Court's decision."

The various parties are concerned with different aspects of this appeal. FIGA and the Florida Department are the appellants. FIGA claims that reinsurance proceeds attributable to the Florida policy should be

paid directly to it, since it assumed the Florida obligations of Signal. FIGA's position is supported by the State of Nevada as amicus curiae.

Excess is the plaintiff-appellee. Its sole interest in this appeal is in upholding the validity of the judgment below insofar as it affects the Florida Insurance Department, which claims that the interpleader action against it was improper under the eleventh amendment. Excess is not concerned with the question of who should receive reinsurance proceeds.

The California Commissioner, defendant-appellee, claims that all reinsurance proceeds should go to it for distribution rather than to either FIGA or CIGA directly. The Reinsurance Association of America, as amicus, supports the position of the California Commissioner.

CIGA, defendant-amicus, claims that it should receive directly any reinsurance proceeds arising from California claims. CIGA was dismissed as a party below because it made no claim to the deposited fund. CIGA's position is relevant, however, because FIGA argues that if CIGA receives a direct payment, then FIGA should also receive a direct payment.

## III. Issues

The following issues are presented on appeal:

A. **Entitlement to the Reinsurance Proceeds**

Whether the district court was correct in its determination that the California Commissioner was the only entity entitled to direct receipt of the reinsurance proceeds.

B. *Equal Protection*

Whether payment to the California Insurance Commissioner is consistent with equal protection.

1. Whether the California statutory distribution scheme would result in greater proportionate payments to CIGA than to other states' guaranty associations.

2. Whether any such unequal payments would violate equal protection.

C. *Procedural Questions*

Whether the district court properly disallowed discovery and, if the judgment below is treated as a summary judgment, whether genuine issues of material fact were unresolved at the time of judgment.

D. *Eleventh Amendment*

Whether the judgment below is binding against the Florida Insurance Department, or whether the Department as part of the executive branch of the Florida state government is immune from federal interpleader action under the eleventh amendment.

## IV. Discussion

### A. Entitlement to Reinsurance Proceeds

The district court awarded the reinsurance proceeds to the California Commissioner on the basis of the reinsurance contract and California law. The reinsurance contract provided that in the event of insolvency, payments would be made "directly to the Company or to its liquidator, receiver, or statutory successor. . . ." This clause is followed by exceptions which are not relevant here. The district court thus set out to determine the "liquidator, receiver, or statutory successor" of Signal. It found that under California law, the California Insurance Commissioner was that entity.

FIGA opposes the district court's finding that reinsurance proceeds should go to the statutory receiver upon insolvency. FIGA submits that any reinsurance proceeds arising from Florida claims should go directly to FIGA. This position is economically motivated. If the proceeds are mixed with the assets of the insolvent companies and then divided up among the many creditors, FIGA's resultant share would be much less than it would receive if it took the proceeds directly.

FIGA argues that giving the payments directly to it—in essence giving it super priority over other creditors and administrative expenses—is equitably mandated since FIGA assumed Signal's obligations in Florida. Reinsurance obligations are trig-

gered by payment of a claim. Prior to the insolvency, when Signal paid a claim, it obtained in turn a claim against Excess for reinsurance payments. After insolvency, FIGA assumed the obligation of paying Signal's claims. Thus FIGA's actions triggered Excess' obligations in this case. FIGA argues that since it brought the reinsurance proceeds into existence, it should be the sole recipient of the proceeds. FIGA further notes that FIGA is funded by companies doing business in Florida and that accordingly FIGA's expenses are eventually passed on to Florida consumers. FIGA thus expands its equity argument: Florida consumers fund FIGA and FIGA's actions gave rise to the reinsurance proceeds. The proceeds should stay in Florida and should not be distributed to non-Florida creditors, otherwise Florida consumers will be victimized by undeserved premium increases.

We look first, as did the district court, to the contract. While FIGA's actions triggered Excess' obligations, the reinsurance proceeds arise from the reinsurance contract. The terms of the contract cannot be ignored in determining the proper recipient of the proceeds.

Contracts are interpreted in accordance with the intent of the parties. *See, e. g., Brobeck, Phleger & Harrison v. Telex*, 602 F.2d 866, 872 (9th Cir.), *cert. denied*, 100 S.Ct. 483, 443 U.S. 981, 62 L.Ed.2d 407 (1979). The plain language of the contract indicates the intent of the parties that the reinsurance proceeds go to the receiver in the event of insolvency. In California, the California Insurance Commissioner is that receiver.[3] California law provides that FIGA will receive payment out of the general assets of the insolvent companies upon distribution.[4]

FIGA does not dispute that California law applies to Signal's insolvency, or that the contract is valid. Rather, it argues that equitable principles require us to look beyond the language of the contract. FIGA, however, cites no case holding that equitable considerations should govern in this situation.[5]

■ The equitable principle of subrogation does not control here. Subrogation entitles one who pays the debt of another to claim the rights of the creditor so paid. *See Restatement of Restitution* § 162 (1937). The reinsurance contract is between the insurance company and the reinsurance company. The individual policyholder has no claim to reinsurance proceeds. The guaranty associations pay insured/claimants and are thus subrogated to the rights of claimants. Because a claimant has no rights against the reinsurance company, neither does the guaranty association in the claimant's shoes.

■ FIGA further argues that an equitable lien on the reinsurance proceeds should be judicially implied to prevent an uncon-

---

3. *See* Cal.Ins.Code § 1057 (West).

4. California Insurance Code § 1033 provides the following priorities for distribution:
   1. Expenses of administration
   2. Unpaid charges due under the provisions of Section 736.
   3. Taxes due to the State of California.
   4. Claims having preference by the laws of the United States and by laws of this state.
   5. All claims of the California Insurance Guarantee Association and associations or entities performing a similar function in other states, together with claims for refund or unearned premiums and all claims of policyholders of an insolvent insurer that are not covered claims. . . .
   6. All other claims.
   This scheme puts FIGA at the fifth level of distribution. As in any insolvency case, there

is a possibility that FIGA will receive less than the full amount owed to it.

5. The few reported lower court decisions involving similar circumstances all awarded reinsurance proceeds to the statutory receiver rather than the guaranty association. *See General Reinsurance Corp. v. Missouri Gen. Ins. Co.*, 458 F.Supp. 1 (W.D.Mo.1977) *aff'd*, 596 F.2d 330 (8th Cir. 1979) (under Missouri law and general contract law statutory receiver, not guaranty association, is entitled to reinsurance fund); *Skandia American Reinsurance Corp. v. Barnes*, 458 F.Supp. 13 (D.Colo.1978) (under Colorado law, Colorado receiver, and not CIGA, is entitled to reinsurance proceeds); *Skandia America Reinsurance Corp. v. Schenck*, 441 F.Supp. 715 (S.D.N.Y.1977) (New York Insurance Superintendent/Receiver, and not New Jersey Guaranty Association, entitled to reinsurance proceeds).

scionable result. An equitable lien may be applied to create an interest in property in order to prevent unjust enrichment. *See Restatement of Restitution* § 161 (1937). It is unjust, FIGA argues, to divide funds generated by FIGA's actions among all creditors. We disagree.

FIGA overstates its case when it claims that it brought the fund into existence. FIGA did not pay premiums to Excess or otherwise contribute to the disputed fund. FIGA merely completed the last event necessary to trigger Excess' obligations. FIGA uses the terminology of "subrogation" and "equitable lien" for its argument that it is simply not fair that FIGA assumed the lion's share of Signal's Florida obligations while all Florida reinsurance proceeds will go to the receiver. Hardship, however, is unavoidable in insolvency cases. The guaranty association's function is to transfer such hardship from the individual policyholder to a larger entity. The receiver's function is to gather all assets and distribute them as fairly as possible and in accordance with statutory priority to all creditors, including the various guaranty associations.

The guaranty associations have no greater hardship claim than any other creditor. The associations exist precisely because insolvencies are anticipated and losses must be absorbed. Granting a super priority to the guaranty association would be unfair to other creditors, including, conceivably, individual policyholders.[6] Reinsurance is considered an asset of the insurance company and its existence is relied upon by creditors and regulating agencies. If FIGA's interpretation were to prevail, all those who relied upon the existence of reinsurance would not receive the benefit of reinsurance upon insolvency.

Thus we conclude that there is no equitable ground for ignoring the language of the contract and California law, both of which indicate that the California Commissioner is the proper recipient of the reinsurance proceeds.

## B. *Equal Protection*

■ FIGA's next argument is that if reinsurance proceeds generated in other states are paid to the California receiver, this will result in favored treatment for CIGA as opposed to non-California guaranty associations, contrary to the principle of equal protection.[7] We find that the record in this case does not show that the California proceedings will give favored treatment to CIGA. The California courts may well support the California Commissioner's posi-

---

6. Other creditors could conceivably include policyholders who become creditors of the insolvent insurers to the extent that guaranty associations fail to fulfill all the insurer's obligations. This could arise because of coverage disputes or because the guaranty association's rules provide for a deductible or a coverage ceiling which would result in less coverage than was contracted for by the insured. CIGA, for instance, does not pay the first $100 of non-worker's compensation claims. It also covers only up to a $500,000 maximum. *See* Calif. Ins. Code § 1063.1(c)(5)–(6) (West). Thus California insureds are general creditors to the extent they are not compensated by CIGA.

7. The argument that CIGA receives favored treatment arises from California Insurance Code § 1063.2(d) which provided in pertinent part:

    (d) *The association* [CIGA] *shall receive the benefit of any amounts recoverable on reinsurance contracts* or treaties entered into by the insolvent insurer which cover any of the liabilities incurred by the insolvent insur-

er in the category or categories involved *provided* such benefits shall be limited to defense costs actually paid out by the association (including defense costs, if any, unpaid at the date of insolvency) on account of claims covered in such contracts or treaties. (Emphasis added.)

FIGA argues that this section will result in CIGA receiving super priority to reinsurance proceeds attributable to California claims. CIGA, which is not a party to this appeal because it has no claim to Florida proceeds, supports FIGA's position. CIGA argues that the statutory language granting CIGA "the benefit" of reinsurance means that CIGA should receive the proceeds directly rather than through distribution by the receiver.

The court below agreed with the California Commissioner's position that CIGA does not receive favored treatment under the California statute, and that the "benefit" language merely means that CIGA will receive a portion of any reinsurance proceeds as part of its share in the distribution proceedings.

tion that CIGA, like FIGA, must stand in line with other creditors for its share upon distribution. FIGA does not allege that CIGA has received or is presently receiving a direct distribution of any reinsurance proceeds. Until such time as FIGA can show that it is receiving disparate treatment, there is no need for us to decide whether such treatment is violative of the right to equal protection.[8] *Cf. Stewart v. M. M. & P. Pension Plan*, 608 F.2d 776 (9th Cir. 1979) (federal court jurisdiction is inappropriate absent a real and present issue).

### C. *Procedural Questions*

FIGA argues that the court below improperly entered its judgment before allowing FIGA discovery and the opportunity to prove compelling considerations of public policy and equity. FIGA suggests that it could have shown, for instance, that it will receive little or nothing in the California distribution proceeding, or that CIGA will receive a greater priority share in such proceedings. The fact that FIGA, like all creditors in insolvency proceedings, may not receive full repayment is one that we have considered in balancing the equities in this case. The ultimate size of FIGA's share upon distribution does not affect our conclusion that the California receiver is the appropriate recipient of the proceeds. Similarly, the speculative suggestion that CIGA will receive a super priority does not change our analysis. FIGA has not made any allegation of fact which, if proved, would alter our conclusions here. The judgment below and the denial of further discovery were therefore appropriate.

### D. *Eleventh Amendment*

The remaining question before the panel is whether the judgment below is binding upon the Florida Department, which claims eleventh amendment sovereign immunity. The eleventh amendment limits the judicial power of the federal courts, excluding juris-

diction over suits "against one of the United States . . . by Citizens or Subjects of any Foreign State." *U.S.Const.* amend. XI. Although the State of Florida itself is not a defendant in this action, the Florida Department argues that Excess' interpleader action against it is the equivalent of a suit against the state. We disagree.

■ To determine whether the eleventh amendment prohibits suit against a state agency, the courts ask whether the state is the real party in interest. *See Ramada Inns, Inc. v. Rosemount Memorial Park Ass'n*, 598 F.2d 1303, 1306 (3rd Cir. 1979). This inquiry requires consideration of the "essential nature and effect of the proceeding." *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).

The essential nature and effect of the instant proceeding does not indicate a violation of Florida's sovereignty. In this action Excess does not seek to recover damages from the Florida Treasury. *See Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) (restating the rule that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment"). Nor does it seek to compel or forbid any action by the State of Florida. *See Hagood v. Southern*, 117 U.S. 52, 66–67, 6 S.Ct. 608, 614, 29 L.Ed. 805 (1887) (enforcement of seemingly private contract barred by eleventh amendment where enforcement would require acts constituting "performance . . . by the state"). Rather, it seeks to discharge an acknowledged obligation to pay reinsurance proceeds.

The dispute here is an essentially commercial one which, in fairness to all parties, must be resolved expeditiously. The pragmatic nature of interpleader proceedings merits consideration. Excess possessed a fund which it properly wished to submit for

---

8. We note, however, that no fundamental right or suspect classification exists here and that FIGA would thus have to show that any statutory scheme favoring CIGA is not minimally rational. *See Williamson v. Lee Optical Co.*,

348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). It may well be rational for the California legislature to favor a California guaranty association.

prompt distribution. Excess did not take a purely adversary posture against the Florida Department, and the court below did not purport to finally determine the Florida Department's rights. The judgment determined only that the California Commissioner should receive immediate control over the fund.

Additionally, we consider that the Florida Department is named as a party here in its capacity as ancillary receiver. It is not sued in a sovereign capacity or because of its performance of any act peculiar to state governance. This distinguishes the case of *Ginter v. State Bar of Nevada*, 625 F.2d 829 (9th Cir. 1980) (state bar association in its licensing capacity is an "arm of the state" and is not subject to suit). Notably, only states license attorneys. Receivership, on the other hand, need not necessarily lie in a state entity.

We recognize Florida's concern for the public welfare of its citizens in seeking to maintain control over the proceeds. The Florida Department may believe that it could best distribute the proceeds in a manner that would assure protection of Florida citizens. Given the overall circumstances of this case, we find that this general public-welfare concern does not constitute an assertion of sovereignty so that the eleventh amendment applies. *Cf. Missouri, Kansas & Texas Ry. v. Missouri R. R. & Warehouse Comm'rs*, 183 U.S. 53, 59–60, 22 S.Ct. 18, 20–21, 46 L.Ed. 78 (1901) (state is not a real party in interest for purposes of diversity jurisdiction where outcome of litigation will not benefit the state as a state, but rather will promote the general welfare of state citizens).

 The proceeding below did not challenge the functions of state government, nor did it threaten state fiscal integrity. Accordingly, we hold that the interpleader action naming as a defendant the Florida Department in its capacity as ancillary receiver of Signal does not constitute an action against the State of Florida so that eleventh amendment sovereign immunity should apply.

In conclusion, the district court properly awarded the reinsurance proceeds to the California Commissioner, and the Florida Department is not immune. The judgment below is AFFIRMED.