## In re INSURANCE ANTITRUST LITIGATION.

### No. MDL 767.

United States District Court, N.D. California.

Oct. 10, 1989.

Edwin A. Heafey, Jr., Raoul D. Kennedy, Richard de Saint Phalle, Dolores A. Dalton, Crosby, Heafey, Roach & May, Oakland, Cal., for Administrative Liaison.

John G. Harkins, Jr., Eleanor Morris Illoway, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Aetna Cas. and Sur. Co.

Alan H. Silberman, Stuart Altschuler, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for Allstate Ins. Co.

Richard E. Sherwood, John G. Niles, O'Melveny & Myers, Los Angeles, Cal., for CIGNA Corp.

David W. Slaby, Robert L. Maines, Pettit & Martin, San Jose, Cal., for CNA Re (U.K.) Ltd.

Lewis A. Kaplan, Allan Blumstein, Maria Bainor, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Constitution Reinsurance Corp.

Martin Frederic Evans, Donald F. Donovan, Colby A. Smith, Debevoise & Plimpton, New York City, for Continental Reinsurance Corp. (U.K.) Ltd. and Unionamerica Ins. Co., Ltd.

Barry L. Bunshoft, Audbin K. Barthold, William J. Casey, Eric J. Sinrod, Hancock, Rothert & Bunshoft, San Francisco, Cal., for Edwards & Payne (Underwriting Agencies) Ltd. (sued herein as Edwards and Payne Management (U.A.), Ltd.)

Jerome N. Lerch, Martin W. Johnson, Wilson, Elser, Moskowitz, Edelman & Dicker, San Francisco, Cal., for Excess Ins. Co., Ltd. and Excess Ins. Group, Ltd.

Stephen M. Axinn, Shepard Goldfein, Michael L. Weiner, Skadden, Arps, Slate, Meagher & Flom, New York City, for General Reinsurance Corp.

Robert B. Green, Irwin, Kerr, Green, McDonald and Dexter, Baltimore, Md., for Thomas A. Greene & Co., Inc.

William A. Montgomery, Thomas P. Luning, William M. Hannay, Marci A. Eisenstein, Kevin D. Evans, John H. Ehrlich, Schiff, Hardin & Waite, Chicago, Ill., for Hartford Fire Ins. Co.

Bartlett H. McGuire, Michael P. Carroll, Douglas I. Brandon, Washington, D.C., for Insurance Services Office, Inc.

Michael L. McCluggage, David L. Schiavone, James T. Nyeste, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Kemper Reinsurance London, Ltd.

David L. Foster, Barbara Hink, Anne Johnson, Wilkie, Farr & Gallagher, New York City, for Mercantile & General Reinsurance Co. of America.

Frederick B. Lacey, Molly S. Boast, Lawrence W. Pollack, Stephen H. Orel, LeBoeuf, Lamb, Leiby & Macrae, New York City, for Peter N. Miller; Robin A.G. Jackson; Merrett Underwriting Agency Management Ltd. (sued herein as Merrett Underwriting Agencies Mgt., Ltd.); Three Quays Underwriting Management Ltd. (sued herein as Three Quays Underwriting, Ltd.); Janson Green Management Ltd. (sued herein as Janson, Green, Ltd.); C.J.W. (Underwriting Agencies) Ltd. (sued herein as C.J. Warrilow–Hine & Butcher, Ltd.); Lambert Bros. (Underwriting Agencies) Ltd. (sued herein as J. Brian Hose & Others, Ltd.); Murray Lawrence & Partners (sued herein as Harvey Bowring, Ltd. —Murray Lawrence & Partners); D.P. Mann Underwriting Agency Ltd. (sued herein as D.P. Mann & Others (U.A.), Ltd.); Ballantyne, McKean & Sullivan Ltd. (sued herein as Ballantyne, McKean & Sullivan, Ltd.); R.K. Carvill & Co., Ltd.

Eugene F. Bannigan, M. Breeze McMennamin, Mary Corrarino, Lord Day & Lord, Barrett Smith, New York City, for North American Reinsurance Corp.

Barry Ostrager, Mark Cunha, Mary Kay Vyskocil, David A. Martland, Simpson, Thacher & Bartlett, New York City, for Oxford Syndicate Management Ltd. (sued herein as K.F. Adler & Others, (U.A.) Ltd. & Others, (U.A.) Ltd.)

John S. Kingdon, John DeQ. Briggs, John C. Pierce, James M. Burns, Howrey & Simon, Washington, D.C., for Prudential Reinsurance Co.

Robert M. Mitchell, Jeffery Anne Tatum, Adams, Duque & Hazeltine, San Francisco, Cal., for Reinsurance Ass'n of America.

Paul R. Haerle, James T. Hendrick, Kathleen McKinley, Nina M. Brooks, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for Terra Nova Ins. Co., Ltd.

Philip H. Curtis, William H. Voth, Hughes, Hubbard & Reed, New York City, for Winterthur Swiss Ins. Co.

Thomas Greene, Deputy Atty. Gen., San Francisco, Cal., for plaintiff State of Cal.

Guido Saveri, John A. Kithas, Saveri & Saveri, San Francisco, Cal., for private plaintiffs.

Holly Lee Wiseman, Asst. Atty. Gen., Montgomery, Ala., for State of Ala.

Richard D. Monkman, Asst. Atty. Gen., Dept. of Law, Juneau, Alaska, for State of Alaska.

Alison J. Butterfield, Chief Counsel, Antitrust Div., Arizona Atty. Gen., Phoenix, Ariz., for State of Ariz.

James R. Lewis, Asst. Atty. Gen., Antitrust Unit, Denver, Colo., for State of Colo.

William M. Rubenstein, Asst. Atty. Gen., Hartford, Conn., for State of Conn.

Michael F. Brockmeyer, Asst. Atty. Gen. and Chief, Antitrust Div., Baltimore, Md., for State of Md.

George K. Weber, Asst. Atty. Gen., Chief, Antitrust Div., Boston, Mass., for State of Mass.

Robert C. Ward, Jr., Asst. Atty. Gen., Lansing, Mich., for State of Mich.

Lisa Tiegel, Sp. Asst. Atty. Gen., St. Paul, Minn., for State of Minn.

Joe R. Roberts, Asst. Atty. Gen., Helena, Mont., for State of Mont.

Laurel A. Price, Deputy Atty. Gen., Trenton, N.J., for State of N.J.

George Sampson, Asst. Atty. Gen., New York City, for State of N.Y.

Marc B. Bandman, Asst. Atty. Gen., Columbus, Ohio, for State of Ohio.

Eugene F. Waye, Deputy Atty. Gen., Harrisburg, Pa., for State of Pa.

James M. Beaulaurier, Asst. Atty. Gen., Seattle, Wash., for State of Wash.

Daniel Huck, Asst. Atty. Gen., Charleston, W.Va., for State of W. Va.

Kevin J. O'Connor, Matthew J. Frank, Asst. Attys. Gen., Madison, Wis., for State of Wis.

Jerry S. Cohen, Cohen, Milstein & Hausfeld, Washington, D.C., for Anastasios Markos T/A Mun. Exxon.

Jeremiah F. Hallisey, Hallisey and Johnson, San Francisco, Cal., for Bay Harbor Park Homeowner's Ass'n, Inc.

Nicholas E. Chimicles, Denise Davis Schwartzman, Greenfield & Chimicles, Haverford, Pa., for Big D Building Supply Corp.

Robert A. Skirnick, Mark W. Gaffney, Kaplan, Kilsheimer & Foley, New York City, for Environmental Aviation Sciences, Inc.

Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, Pa., for Carlisle Day Care Center, Inc.

Lawrence Walner, Lawrence Walner & Associates, Inc., Chicago, Ill., for P & J Casting Corp.

David Berger, Harold Berger, H. Laddie Montague, Jr., Howard Langer, Jeffrey Rockman, Berger & Montague, P.C., Philadelphia, Pa., for Henry L. Rosenfeld.

Stanley Nemser, David L. Weisberg, Wolf, Popper, Ross, Wolf & Jones, New York City, for Ace Check Cashing, Inc.

Judah I. Labovitz, Cohen, Shapiro, Poliser, Shiekman & Cohen, Philadelphia, Pa., for Discount Plywood Centers, Inc.

Warren Rubin, Gross, Sklar & Metzger, Philadelphia, Pa., for Acme Corrugated Box Co., Inc.

Robert M. Roseman, Mark S. Goldman, Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C., Philadelphia, Pa., for Bensalem Township Authority, et al.

J. Daniel Sagarin, Hurwitz & Sagarin, Milford, Conn., for Durawood, Inc.

Charles R. Van De Walle, Martin, Van De Walle, Guarino & Donohue, Great Neck, N.Y., for Keyboard Communications, Inc.

Louis M. Tarasi, Jr., Tarasi & Johnson P.C., Pittsburgh, Pa., for Carmella M. "Boots" Liberto Trading and R.J. Liberto, Inc.

Marvin Miller, Patrick E. Cafferty, Washlow, Chertow & Miller, Chicago, Ill., for Glabman Paramount Furniture Mfg., Co., Inc.

Daniel Berger, Bernstein, Litowitz, Berger & Grossman, New York City, for Jerry Grant Chemical Associates, Inc.

Zell Davis, Jr., McGee, Jordan, Shuey, Koons, Schroeder & Morris, P.A., Lake Worth, Fla., for Les–Ray Bobcat, Inc. and Kirlington Park, Inc.

**SCHWARZER, District Judge.**

## I. INTRODUCTION

Nineteen states and numerous private plaintiffs have brought actions against a group of insurance companies, reinsurance companies, underwriters, brokers, and individuals, and the Insurance Services Office, Inc. ("ISO"), charging them with violations of the federal antitrust laws and state laws.[1] The charges rest on alleged conspiracies, boycotts, threats, intimidation, and other coercive conduct by defendants to restrict the availability of certain coverage under policies for commercial general liability insurance ("CGL") and property insurance. The filing of these complaints followed lengthy investigations conducted by the regulatory agencies of several states.[2]

Defendants have moved to dismiss, for judgment on the pleadings, and for summary judgment, and plaintiffs have made cross-motions. For purposes of these motions, the well-pleaded allegations of the complaints are accepted as true, and any factual disputes and inferences are resolved in plaintiffs' favor.

Copies of the Court's proposed ruling were distributed to counsel well in advance of the hearing, and the Court has considered the arguments of counsel in reach-

ing the decision reflected in this memorandum.

## II. FACTUAL BACKGROUND

CGL insurance protects the insured against the risk of liability to third parties for bodily injury or property damage. It is purchased by businesses, non-profit groups, and governmental entities. Defendants Hartford Fire Insurance Company ("Hartford"), Allstate Insurance Company ("Allstate"), Aetna Casualty and Surety Company ("Aetna"), and CIGNA Corporation ("CIGNA") are primary insurers who are major providers of CGL insurance.[3] CGL insurance is written predominantly on standard policy forms developed by ISO.

ISO is an association of more than one thousand property or casualty insurers, including Hartford, Allstate, Aetna, and CIGNA. It is licensed as a rating, rate service, and advisory organization in all fifty states. One of its primary functions is to develop standardized policy forms for property and casualty insurance that comply with state regulations and will be accepted by state insurance departments. On behalf of its members, ISO files standardized policy forms with state insurance departments.

---

1. For a list of the parties and of the actions encompassed by this ruling, see Appendix.

2. Moreover, under the Court's pretrial order, the parties were free to conduct discovery insofar as necessary for these motions.

3. CIGNA is a holding company having subsidiaries which are primary insurers.

ISO also collects historical loss data, projects future loss trends, and calculates advisory rates for insurance.

In the late 1970s, ISO began to develop a revision of the standard CGL form then in use. In 1984, ISO filed or lodged with state insurance departments two proposed new policy forms for CGL insurance. These forms substantially modified coverage previously available to the insured. One of the forms was a "claims-made" policy under which coverage was limited to claims made during the policy period regardless of when the occurrence out of which the claim arose had taken place. This represented a reduction in the coverage available under the previous CGL policy form which was an "occurrence-based" form; under that form, the insured was covered for claims arising out of occurrences during the policy period, no matter when asserted, thus exposing insurers to so-called "long tail risks" that could arise long after the policy period. The proposed claims-made form reduced that exposure and shifted the risk of future claims to the insured. The other proposed form was a modified occurrence policy.

These forms became the subject of widespread debate and controversy in the insurance industry. Considerable differences of opinion arose over what should trigger coverage, whether retroactivity of claims-made coverage should be limited, whether the pollution exclusion should be modified, and whether defense costs should be limited by the policy limits.

In their complaint, plaintiffs charge defendants Hartford, CIGNA, Allstate, and Aetna with engaging in a concerted effort to block adoption of the 1984 forms because those forms did not restrict coverage sufficiently. Plaintiffs allege that these defendants entered into conspiracies with certain domestic and foreign defendant reinsurance companies, underwriters, and their representatives to "boycott" the 1984 forms unless a retroactive date was added to the claims-made form and a pollution exclusion and defense cost cap were added to both forms. Plaintiffs allege that as a result of the efforts of Hartford, Allstate, Aetna, and CIGNA, certain domestic and London reinsurers threatened to "boycott" North American CGL risks unless these changes were made in the claims-made form and the occurrence form was eliminated. Also as a result of these efforts, the ISO executive committee in September 1984 voted to include a retroactive cut-off date in the claims-made policy form, to exclude pollution coverage from both forms, but to defer until later limiting defense costs, and to offer an occurrence form along with the new claims-made form.

Following this agreement, ISO, Hartford, Aetna, and representatives of the London reinsurers undertook joint efforts to promote the new forms. Reinsurers refused to accept new reinsurance business or renew old business unless the primary carrier agreed to switch to the claims-made form when available. Reinsurers also imposed "sunset dates" in their treaties limiting their exposure to losses on occurrence policies. Reinsurance underwriters also entered into an agreement to exclude pollution liability coverage from reinsurance treaties.

During the period from 1984 through 1986, when these events are alleged to have occurred, ISO lodged or filed the proposed forms with the insurance departments of all states. Departments in thirty-five states held public hearings and the policy terms that are the subjects of the complaints were discussed within the industry and in public forums. As a result ISO filed or lodged several revisions of its proposed forms with the state insurance departments. At the conclusion of the various states' proceedings in 1986, all of the plaintiff states and the two non-plaintiff states in which individual plaintiffs reside had approved the ISO forms with the following exceptions: Massachusetts and New Jersey disapproved them, New York approved only the occurrence form, and California and Colorado, having no procedure for approval, took no action. Thereafter ISO withdrew its data collection and risk estimation support for the pre-1984 CGL form.

In 1986, ISO and certain defendants agreed that ISO should also develop standard CGL umbrella and excess policy language. In June 1986 ISO released policy language providing for a retroactive date on claims-made policies, a pollution exclusion, and defense costs within policy limits.

Finally, in 1987 domestic and London retrocessional reinsurers [4] are alleged to have entered into an agreement regarding property insurance to use their "best endeavors to ensure that all U.S.A. and Canadian exposed [property] insurance/reinsurance business attaching on or after 1st January, 1987 will only be written where the original business includes a seepage and pollution exclusion wherever legal and applicable."

## III. THE FEDERAL LAW VIOLATIONS CHARGED

The state complaints fall into two groups depending on when they were filed. The First Wave Complaints each contain eight federal claims.[5] The Second Wave Complaints each contain six federal claims.[6] All complaints also contain pendent state law claims. The private complaints track the state complaints.

The First Claim of the Second Wave Complaints alleges a global conspiracy by all defendants in violation of Section One of the Sherman Act, 15 U.S.C. § 1,

for the purpose and with the effect of shrinking the scope of CGL property/casualty insurance and reinsurance and retrocessional reinsurance, ... to ... reduce financial exposure to such risks and to increase underwriting profits therefrom.

(Conn.Compl't ¶ 117.) Plaintiffs allege that defendants used boycotts, coercion, and intimidation to limit available coverage. (*Id.* ¶ 118(a).) No corresponding claim is made in the First Wave Complaints.

The Second Claim of the Second Wave Complaints and the First through Fourth Claims of the First Wave Complaints allege a conspiracy by defendants Hartford, Allstate, Aetna, CIGNA, ISO, and certain others [7] to manipulate the ISO design process for CGL forms to limit the available coverage. Plaintiffs allege that defendants conspired to restrict the terms under which reinsurance coverage would be provided for CGL risks, to refuse to provide reinsurance unless the 1984 form were amended to incorporate defendants' terms, to coerce ISO and its members to adopt the coverage terms and exclusions agreed to by defendants, and to boycott the forms unless amended. (Conn.Compl't ¶¶ 122–123; Cal. Compl't ¶¶ 113–114, 118–119, 123–124, 128–129.)

---

**4.** Retrocessional insurance is insurance for reinsurers.

**5.** First Wave Complaints were filed by Alabama, Arizona, California, Massachusetts, New York, West Virginia, and Wisconsin. Citations to First Wave Complaints are to the California complaint.

**6.** Second Wave Complaints were filed by Alaska, Colorado, Connecticut, Louisiana, Maryland, Michigan, Minnesota, Montana, New Jersey, Ohio, Pennsylvania, and Washington. Citations to Second Wave Complaints are to the Connecticut complaint.

**7.** The defendants named in these claims are as follows:

The Second Claim of the Second Wave Complaints alleges that defendants Robin A.G. Jackson, Merrett Syndicate, Three Quays, Janson Green, Edwards & Payne, C.J.W., Thomas A. Greene, R.K. Carvill, RAA, General Re, Constitution Re, Mercantile & General Re, Prudential Re, North American Re, and Winterthur Swiss

and other co-conspirators were involved. Louisiana also names INA.

The First Claim of the First Wave Complaints alleges concerted action by domestic defendants and also names RAA, General Re, Constitution Re, Mercantile & General Re, Prudential Re, North American Re, Winterthur Swiss, and Thomas A. Greene.

The Second Claim of the First Wave Complaints alleges concerted action by foreign defendants and also names Robin A.G. Jackson, Merrett Syndicate, Three Quays, Janson Greene, Edwards & Payne, C.J.W., J. Brian Hose, R.K. Carvill, and Thomas A. Greene. New York and Wisconsin do not name J. Brian Hose; Arizona does not name Robin A.G. Jackson.

The Third Claim of the First Wave Complaints alleges concerted action by domestic and foreign defendants and names the same defendants as in the First and Second Claims except for C.J.W. and J. Brian Hose.

The Fourth Claim of the First Wave Complaints alleges concerted action by domestic and foreign defendants and ISO and names the same defendants as in the Third Claim.

The Third Claim of the Second Wave Complaints and the Fifth Claim of the First Wave Complaints in substance charge certain defendants [8] engaged in the reinsurance business at Lloyd's of London with a conspiracy to restrict the terms under which reinsurance coverage would be provided for CGL risks and to refuse to reinsure CGL risks on occurrence forms by coercion and intimidation of primary insurers, among other things. (Conn.Compl't ¶¶ 127–128; Cal.Compl't ¶¶ 133–134.)

The Fourth Claim of the Second Wave Complaints and the Sixth Claim of the First Wave Complaints in substance charge certain defendants [9] engaged in the reinsurance business at Lloyd's of London with a conspiracy to restrict the terms under which casualty reinsurance coverage would be provided for CGL risks and to limit the availability of pollution coverage in primary casualty insurance. No boycott, coercion, or intimidation is alleged. (Conn. Compl't ¶¶ 132–133; Cal.Compl't ¶¶ 138–139.)

The Fifth Claim of the Second Wave Complaints and the Eighth Claim of the First Wave Complaints in substance charge certain defendants [10] engaged in the reinsurance business at Lloyd's of London with a conspiracy to restrict the terms on which property insurance and reinsurance coverage would be provided and to limit its availability by, among other things, agreeing to boycott the provision of retrocessional insurance unless the primary insurance excluded seepage, pollution, and contamination coverage. (Conn.Compl't ¶¶ 137–138; Cal.Compl't ¶¶ 148–149.)

The Sixth Claim of the Second Wave Complaints and the Seventh Claim of the First Wave Complaints charge ISO, Allstate, Hartford, Aetna, and certain other defendants [11] with a conspiracy to restrict terms and conditions under which umbrella and excess insurance would be available. No boycott, coercion, or intimidation is charged. (Conn.Compl't ¶¶ 142–143; Cal. Compl't ¶¶ 143–144.)

## IV. THE MOTIONS BEFORE THE COURT

Defendants have filed five motions to dismiss or for summary judgment on the following grounds:

A. Asserting antitrust immunity under the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015 ("the McCarran Act"), all defendants have moved under Federal Rules of Civil Procedure 12(b)(6) and 56 to dismiss or for summary judgment.

B. Asserting the state action immunity doctrine, all defendants have moved under Rule 56 for summary judgment against all plaintiffs except California, Alaska, Colorado, and Montana on (a) the so-called global conspiracy claim of the Second Wave complaints, and (b) the policy form development claims.

C. Asserting lack of standing, all defendants except ISO, INA, Hartford, Allstate, Aetna, and CIGNA have moved under Rule 12(b)(6) for dismissal of all claims against them. (This motion does not encompass the claims against Merrett and Three Quays alleging an agreement in restraint of trade in the excess and umbrella insurance market.)

D. Asserting that there is "no factual allegation linking [them] in a 'global' conspiracy," foreign reinsurer defendants have moved under Rule 12(b)(6) to dismiss the global conspiracy claim of the Second Wave complaints.

---

**8.** Peter N. Miller, Robin A.G. Jackson, Merrett Syndicate, Three Quays, Janson Greene, Edwards & Payne, and Ballantyne McKean. Arizona does not name Peter N. Miller or Robin A.G. Jackson.

**9.** Merrett Syndicate, Murray Lawrence, Edwards & Payne, D.P. Mann, C.J.W., Unionamerica, Terra Nova, Oxford, CNA Re, and Ballantyne McKean. Wisconsin does not name CNA Re and does name Robin A.G. Jackson.

**10.** Unionamerica, Terra Nova, Excess, Edwards & Payne, Kemper Re, Merrett Syndicate, and Continental Re. Oxford is named only in all the Second Wave Complaints except Alaska's. Wisconsin also names CNA Re.

**11.** Merrett Syndicate and Three Quays. CIGNA is named only in the Second Wave Complaints. Louisiana also names INA.

E. Asserting lack of subject matter jurisdiction and international comity, foreign reinsurer and retrocessional reinsurer defendants and one broker have moved under Rule 12(b)(1) to dismiss the two claims alleging conspiracies to eliminate pollution coverage.

The States have moved to strike the defense based on the state action immunity doctrine.

## V. DISCUSSION

### A. THE McCARRAN–FERGUSON ACT DEFENSE

Defendants have moved for summary judgment on all federal claims on the ground that their conduct is immunized from antitrust liability by the McCarran Act. Although the primary thrust of the motion is said to be directed at those claims which are based on policy form development activities, the controlling principles apply to defendants' underwriting-related actions as well.[12] Stripped of their pejorative allegations, those claims charge a conspiracy to reduce the exposure of defendant insurers and reinsurers under CGL policies. The defendants sought to accomplish their objective by bringing about changes in standard policy language and by avoiding underwriting or reinsuring risks written on disfavored policy terms. All of this they did in large part by collective action, and it may be assumed that plaintiffs could prove a consequent lessening of competition among defendants and a diminution of options available in the market for CGL insurance, resulting in a restraint of trade.

In the absence of the McCarran Act, those allegations may well state a claim for relief under the Sherman Act. The issue raised by these motions is whether plaintiffs could prove a set of facts under those general allegations that would entitle them to relief notwithstanding the McCarran Act.

That Act states:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ...: Provided, That ... the Sherman Act, ... the Clayton Act, and ... the Federal Trade Commission Act ... shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012.

Section 1013(b) of the Act further provides:

Nothing contained in this chapter shall render the ... Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

■ The McCarran Act created limited antitrust immunity for the business of insurance following the Supreme Court's departure, in *United States v. South–Eastern Underwriters Association*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), from prior holdings that insurance is not a transaction in interstate commerce. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 538–39, 98 S.Ct. 2923, 2928–29, 57 L.Ed.2d 932 (1978). It was passed in response to widespread concern that the states should not be precluded from continuing to regulate and tax the insurance industry. It immunizes the business of insurance from the antitrust laws but only to the extent that it is regulated by the states and does not involve boycott, coercion, or intimidation. *See Feinstein v. Nettleship Co.*, 714 F.2d 928, 931 (9th Cir. 1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984). Like all antitrust immunities, it must, of course, be narrowly construed. *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440

---

**12.** Those defendants who are named in claims asserting conspiracies in connection with the reinsurance markets have also moved to dismiss on other grounds. They join in this motion as an alternate ground for dismissal. *See infra* § V.C.

U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979).

The application of the McCarran Act immunity involves a three step analysis:

(1) Whether the conduct is within the scope of the business of insurance;

(2) Whether that business is regulated by the states; and

(3) Whether the conduct involves boycott, coercion, or intimidation.

### (1) The Business of Insurance

In *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), the Supreme Court stated the criteria for what constitutes the business of insurance for purposes of the McCarran Act as follows:

> *first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry.

458 U.S. at 129, 102 S.Ct. at 3009.

And in *Group Life & Health Insurance Co. v. Royal Drug Co.*, the Court said:

> References to the meaning of the "business of insurance" in the legislative history of the McCarran–Ferguson Act strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk. Thus, one of the early House Reports stated: "The theory of insurance is the distribution of risk according to hazard, experience, and the laws of averages. These factors are not within the control of insuring companies in the sense that the producer or manufacturer may control cost factors."

440 U.S. at 220–21, 99 S.Ct. at 1078 (citation omitted).

■ Plaintiffs do not dispute that the activities of defendants insofar as they relate to the terms and conditions of primary, excess, or umbrella insurance, are the business of insurance within the meaning of the McCarran Act. (*See* Plaintiff States' Unified Opposition Brief ("Unified Opp.") 37–40.) They contend, however, that rein-surance is not the business of insurance because it relates only indirectly to the spreading of the policyholder's risk and because, they contend, it is not an integral part of the policy relationship between the insurer and the insured. (*Id.*)

There is no authority for excluding reinsurance from the business of insurance. On the contrary, reinsurance was specifically referred to as a part of the business of insurance in the legislative history of the McCarran Act. *See* 90 Cong. Rec. A4406 (1944); 89 Cong.Rec. 6528 (1943). The Ninth Circuit applied the McCarran exemption to reinsurers as well as to the primary insurer in *Feinstein.* 714 F.2d at 930.

Plaintiffs urge an unreasonably narrow application of the *Pireno* test. Their own description establishes that reinsurance is an integral and vital part of the business of insurance. The complaints define reinsurance as "insurance for insurers." (*E.g.*, Conn.Compl't ¶ 4(p); Cal.Compl't ¶ 4(o).) They go on to describe reinsurance as

> a transaction whereby one insurance company, the reinsurer, agrees to indemnify another insurance company, the primary (or "ceding") insurer, for a designated portion of the insurance risks underwritten by the primary insurer. Reinsurance protects the primary insurer from catastrophic losses, and is heavily relied upon by prudent primary insurers. It also allows the primary insurer to sell more insurance than its own financial capacity might otherwise permit. Thus, the availability of reinsurance affects the ability and willingness of primary insurers to provide insurance to their customers.

(Conn.Compl't ¶ 4(p); *see also* Cal.Compl't ¶¶ 26–29, 34.)

Thus, reinsurance is no less a part of the process of underwriting and spreading risks than primary insurance. Plaintiffs' allegations rest, moreover, on the premise that the terms on which reinsurance is available affect the terms on which primary insurance is written and that the terms and availability of reinsurance directly affect the availability of insurance cover-

age to consumers. (Unified Opp. 13–16.) As plaintiffs' brief puts it, "by conspiracy to eliminate reinsurance for the consumer-demanded coverages, the reinsurers acted anticompetitively in reinsurance markets ... [which] led inexorably to an injury to the States in the interrelated primary insurance markets." (*Id.* at 76.) Because reinsurance is thus an element of the policy relationship with the insured, it is part of the business of insurance. *See also SEC v. National Sec., Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1960) (business of insurance includes "activities of insurance companies [that] relate ... closely to their status as reliable insurers").

By the same logic, retrocessional insurance, which is "insurance for reinsurers" (Conn.Compl't ¶ 4(r)), is part of the business of insurance.[13]

### (2) *Regulation by the States*

■ The condition of state regulation is satisfied by "a state regulatory scheme possess[ing] jurisdiction over the challenged practice." *Feinstein*, 714 F.2d at 933. "It is not necessary to point to a state statute which gives express approval to a particular practice." *Id.; see Klamath–Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1287 (9th Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983); *Dexter v. Equitable Life Assur. Soc.*, 527 F.2d 233, 236 (2d Cir.1975); *Lawyers Title Co. of Mo. v. St. Paul Title Ins. Co.*, 526 F.2d 795, 797–98 (8th Cir.1975); *Ohio AFL–CIO v. Insurance Rating Bd.*, 451 F.2d 1178, 1181–84 (6th Cir.1971), *cert. denied*, 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972); *see also* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 210.1b (Supp.1988) (McCarran immunity distinguished from *Parker v. Brown* immunity; the former requiring only the existence of a state regulatory scheme, without regard to the intensity of state regulation).

This case involves the insurance business in twenty-one states.[14] The Ninth Circuit has held that California's scheme of regulation satisfies the McCarran Act. *Addrisi v. Equitable Assur. Soc. of the United States*, 503 F.2d 725, 728 (9th Cir.1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975). The Court takes judicial notice of the laws of the other jurisdictions.[15] Each state has an insurance department with jurisdiction over policy forms. Sixteen of the plaintiff states and the two nonplaintiff states in which private plaintiffs reside require filing and review of policy forms, including umbrella and excess policies offered by admitted insurers. All of the states have licensed ISO and permit joint action by ISO and insurance companies with respect to policy forms. All of the states have unfair insurance trade practice statutes enabling them to proceed against conduct such as that alleged in the complaints. Although plaintiffs contend that reinsurance and umbrella and excess insurance are not regulated by the states, these statutes are broad enough to apply to any persons in the business of insurance, including reinsurers.[16] These statutory schemes are sufficient to qualify under section 1012(b) of the McCarran Act. *See SEC v. National Securities, Inc.*, 393 U.S. 453, 459–60, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969) (state laws protecting or regulating, directly or indirectly, relation-

---

**13.** The argument that the exemption is lost as a result of joint action with non-exempt entities is without merit. *Klamath–Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1288 n. 12 (9th Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

**14.** The nineteen plaintiff states plus Florida and Illinois, the two non-plaintiff states in which private plaintiffs reside.

**15.** See Defendants' State–by–State Appendix accompanying their McCarran Act motion. The facts set forth in this paragraph have not been disputed in plaintiffs' opposition brief.

**16.** Cal.Insur.Code § 790.01 is typical:

This article applies to reciprocal and inter-insurance exchanges, Lloyds insurers, fraternal benefit societies, fraternal fire insurers, grants and annuities societies, insurers holding certificates of exemptions, motor clubs, nonprofit hospital associations, agents, brokers, solicitors, surplus line brokers and special lines surplus line brokers as well as *all other persons engaged in the business of insurance.*

(Emphasis added.)

ship between insurer and policy holder qualify); *FTC v. National Cas. Co.*, 357 U.S. 560, 564–65, 78 S.Ct. 1260, 1262, 2 L.Ed.2d 1540 (1958) (state unfair insurance advertising laws qualify); *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 421 (4th Cir.1984) (state unfair insurance practice laws that provide for administrative supervision and enforcement qualify).

Plaintiffs' argument that the regulatory schemes of the states do not reach the allegations of subversion of ISO's decision-making process and concerted activity to restrict the availability of coverages in the market is self-defeating. To avoid McCarran Act immunity, plaintiffs rely on allegations of boycott, coercion, and intimidation, and contend that this conduct is prohibited by the states. That prohibition is indeed contained in the unfair practice acts of each state, but the fact that it is satisfies the regulation prerequisite to immunity under section 1012.[17] *See In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558–60 (8th Cir.), *cert. denied,* ― U.S. ―, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989).

Plaintiffs' argument that the standards for state action immunity under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), should apply to the McCarran Act lacks any support. As Professors Areeda and Hovenkamp point out, if the regulatory requirements under McCarran "were to coalesce with the *Parker* requirements, the scope of the McCarran–Ferguson Act would be largely irrelevant as a practical matter." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 210.1b, at 97 (Supp.1988). (*See infra* § V.B(1).) Such an interpretation would tend to nullify Congressional intent in adopting the McCarran Act.

### (3) *The Exclusion of Boycott, Coercion, and Intimidation*

The States have submitted a Statement of Material Facts in support of their unified opposition brief. (Unified Opp. 6–16.) The following facts are material to this section of the opinion.

Twenty of the defendants, including primary insurers, reinsurers, brokers, and underwriters, dissatisfied with the CGL forms approved by ISO in 1984 because those forms failed to eliminate occurrence and pollution coverage, "agreed to and undertook a course of concerted action" to limit the availability of certain CGL coverages, and twelve other defendants ultimately joined in. (*Id.* at 10–11.) This course of action included the following activities. To coerce ISO into revising its 1984 CGL forms, defendant reinsurers agreed to and did announce that reinsurance would not be provided for coverage written on the 1984 form. (*Id.* at 11.) In addition, certain defendants took "coercive action" by agreeing to announce and announcing that they would not provide reinsurance on occurrence policies and would impose sunset clauses in their coverage.[18] (*Id.* at 12.) Certain defendants took "coercive action" by agreeing to include and including a pollution exclusion in their reinsurance treaties. (*Id.* at 13–14.) Certain defendants made a "coercive statement of intention not to provide reinsurance unless the primary policy excludes all property pollution coverage." (*Id.* at 14–15.) Finally, certain defendants agreed to eliminate the same coverage from excess and umbrella policy forms. (*Id.* at 15–16.) And ISO withdrew statistical support for its 1973 form. (*Id.* at 12.)

It will be noted that plaintiffs' statement does not allege a boycott. Nor does it (or the complaints) describe conduct that "accords with the common understanding of a boycott." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 552, 98 S.Ct. 2923, 2935, 57 L.Ed.2d 932 (1978). As the Supreme Court described the conduct there in issue,

The four insurance companies that control the market in medical malpractice

---

**17.** Cal.Insur.Code § 790.03(c) is typical:
 Entering into any agreement to commit, or by any concrete action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance.

**18.** A "sunset clause" limits the reinsurer's liability to those claims presented to it by the primary insurer prior to a specified date.

insurance are alleged to have agreed that three of the four *would not deal on any terms with the policyholders* of the fourth. As a means of ensuring policyholder submission to new, restrictive ground rules of coverage, St. Paul obtained the agreement of the other petitioners, strangers to the immediate dispute, *to refuse to sell any insurance to its policyholders.* "A valuable service germane to [respondents'] business and important to their effective competition with others was withheld from them by collective action."

The agreement binding petitioners *erected a barrier between St. Paul's customers and any alternative source* of the desired coverage, effectively foreclosing all possibility of competition anywhere in the relevant market. *This concerted refusal to deal went well beyond a private agreement to fix rates and terms of coverage,* as it denied policyholders the benefits of competition in vital matters such as claims policy and quality of service.

*Id.* at 552–53, 98 S.Ct. at 2935–36 (citation omitted) (emphasis added).

In contrast, plaintiffs here charge no more than an agreement to restrict coverage. But they seek to piggyback this charge on conclusory allegations of pressure and compulsion that echo *Barry.* The decision in *Barry,* however, turned not on the pressure and compulsion directed at policy holders to submit to curtailed coverage, but on the agreement with competitors not to deal with those policy holders on any terms. As the Court said:

Solely for the purpose of forcing physicians and hospitals to accede to a substantial curtailment of the coverage previously available, St. Paul induced its competitors to refuse to deal on any terms with its customers. *This agreement did not simply fix rates or terms of coverage;* it effectively barred St. Paul's policyholders from all access to alternative sources of coverage and even from negotiating for more favorable terms elsewhere in the market. The pact served as a tactical weapon invoked by St. Paul in support of a dispute with its

policyholders. *The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott.*

*Id.* at 544–45, 98 S.Ct. at 2931 (emphasis added).

Thus, the issue is not whether defendants used pressure to reduce the coverage available to buyers of insurance. The issue is whether they entered into concerted refusals to deal that denied consumers access to the markets for the desired coverages. The Ninth Circuit explained the meaning of boycott in *Feinstein:* "Because [the agreement] in no way limited the doctors' ability to deal with third parties, the agreement itself is not an agreement to boycott or coerce the plaintiff to purchase the defendants' insurance." 714 F.2d at 933.

The distinction between lawful joint action and prohibited boycott and coercion is also explained in *Proctor v. State Farm Mutual Automobile Insurance Co.,* 561 F.2d 262 (D.C.Cir.1977):

The facts in *South–Eastern Underwriters* are a useful guidepost. Logically speaking, a simple agreement among insurance companies to charge certain premium rates could be viewed as a boycott agreement, since its observance would result in a collective refusal to deal with policyholders except at a fixed price. But the Supreme Court's opinion in *South–Eastern Underwriters* did not characterize the basic rate-fixing agreement in that case in terms of "boycott, coercion, or intimidation"; those terms were reserved for the additional activities utilized to enforce the agreement. Since the McCarran Act was passed in response to *South–Eastern Underwriters,* and since a construction of the boycott provision to encompass a simple rate-fixing agreement would indeed emasculate the Act's antitrust exemption, it is reasonable to infer that in a rate-setting context something in the way of enforcement activity would be required to make out a claim of "boycott,

coercion, or intimidation" within the meaning of the Act.

*Id.* at 274 (citation omitted).[19]

This interpretation of boycott and coercion has been consistently followed, in the context of coverage as well as rates. *See, e.g., Meicler v. Aetna Cas. and Sur. Co.,* 506 F.2d 732, 734 (5th Cir.1975) (parallel actions of insurance companies to refuse to offer insurance except under rate regulation scheme adopted by state not a boycott); *UNR Indus. Inc. v. Continental Ins. Co.,* 607 F.Supp. 855, 862–63 (N.D.Ill.1984) (conspiracy among insurance companies to refuse to offer occurrence policies not a boycott); *Grant v. Erie Ins. Exch.,* 542 F.Supp. 457, 464–66 (M.D.Pa.1982) (conspiracy to refuse to offer insurance covering work loss benefits of individuals killed in motor vehicle accidents not a boycott) *aff'd mem.,* 716 F.2d 890 (3d Cir.), *cert. denied,* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983).

Professors Areeda and Hovenkamp concur with this view and reject the interpretation of *Barry* urged by plaintiffs:

The implications of *St. Paul* are not clear. On the one hand, a horizontal agreement among competitors to set the terms of insurance policies—for example, price fixing—is a collective agreement not to deal on any other terms; by the agreement, each enlists the aid of the other, a third party, "to compel capit-

ulation by the boycotted group," namely, insurance buyers. In this sense, virtually any horizontal agreement among competitors could be called a "boycott."

However, there are two reasons for supposing that the Supreme Court did not mean to go that far. First, such a reading would eviscerate the immunity for horizontal agreements on the "business of insurance" and thus seems inconsistent with the statute. Second, *St. Paul* itself did not involve an agreement to adopt similar terms. Instead, it was alleged that three insurers withdrew from the market for an anticompetitive purpose.

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 210.2, at 107–08 (Supp.1988).

■ The gravamen of the cases before the Court is alleged horizontal agreements relating to the terms on which the participants were willing to write insurance and reinsurance. By joint action in the ISO and in the reinsurance and umbrella and excess insurance markets, the various defendants sought to bring about the use of policies that would limit their exposure. There is no charge and no evidence that any defendants conspired to refuse to do business with any person or firm to achieve their objectives, or that by other improper means they enforced their collective decisions against others.[20]

---

**19.** The *Proctor* court referred to the Supreme Court's opinion in *United States v. South–Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which described the conduct of defendants as consisting of coercion and intimidation to force non-member insurance companies into the conspiracies and to compel persons who needed insurance to buy only from South–Eastern Underwriters on its terms.

**20.** At the hearing, plaintiffs argued that ISO's withdrawal of statistical support for the 1973 policy forms after regulatory approval had been given by the relevant states to new forms amounted to coercion. The complaints allege in relevant part:

On July 1, 1987, ISO officially withdrew "support" of the 1973 CGL form. "Support" in this context includes the normal data collection and actuarial services performed by ISO in aid of its member companies. Without such support, most ISO members could not

continue to use the 1973 occurrence form, because it is very difficult and expensive for any single company to duplicate the critical ISO support functions. (Cal.Compl't ¶ 99; Conn.Compl't ¶ 103.)

The conduct alleged, termination of statistical support for a superseded policy form, is on its face reasonable conduct that one would expect in the normal course of business. There is nothing inherently coercive or wrongful about it. There is no allegation that any insurer desired to continue to write insurance on the 1973 policy form but was coerced by defendants into not doing so by means of this conduct, and plaintiffs did not offer to amend their complaints or conduct specific discovery on this point. The allegation that "most ISO members" would find it "difficult and expensive ... to duplicate the critical ISO support functions" is not sufficient to warrant subjecting these defendants to an antitrust action. *See Ocean State Physicians Health Plan Inc. v. Blue Cross & Blue Shield of Rhode Island,* 883 F.2d 1101, 1109 n. 9

The distinction between prohibited boycott and coercion and immune joint activities is illustrated by *In re Workers' Compensation Insurance Antitrust Litigation*, 867 F.2d 1552 (8th Cir.), *cert. denied*, ____ U.S. ____, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989). That court held that "the practice of mere price fixing, i.e. a refusal to deal except at a specified price, without more," is not a McCarran Act boycott. *Id.* at 1561. "The crucial element ... [of a boycott] is an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete." *Id.* at 1561, n. 14 (quotation omitted). In reversing a grant of summary judgment of no boycott, the *Workers' Compensation* court relied on evidence of an agreement to exclude competing insurers from membership in the Minnesota Rating Association; such membership was required by Minnesota law as a condition to writing workers' compensation insurance in the state. *Id.* at 1563. In contrast, in the instant case the allegations are limited to collective refusals to do business except upon terms acceptable to defendants. There is not even a suggestion that any underwriter or reinsurer (or anyone else) was prevented from having free and unimpaired access to any market.

The purpose of McCarran Act immunity is to permit joint action by insurers and underwriters within the states' regulatory schemes to formulate policy terms and determine coverage. While it is not a necessary part of the policy development process that the participants would then offer substantially similar policies to the public, it is a consequence that could be reasonably anticipated. To subject the participants in the collective form development process to the risk of antitrust liability for using the product of that process would effectually nullify the McCarran Act. It makes no

sense, therefore, for the plaintiffs to rest their boycott claim on the allegation of such an agreement. It is also implicit that joint action comprehends efforts to seek agreement by others, including those who might be unwilling to agree were it not for economic exigencies, and again it makes no sense to assert that such efforts constitute non-immune coercion.

What the McCarran Act leaves unprotected is conduct which goes beyond the making and implementation of agreements to do business only on terms acceptable to the participant (even if such agreements would otherwise violate Section 1), such as refusals to deal on any terms and exclusion from alternative sources. *See Barry*, 438 U.S. at 544–45, 98 S.Ct. at 2931. Such conduct is not charged here.

■ Dismissal of a complaint for failure to state a claim is not proper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). But judgment of dismissal is appropriate if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir.1988). Conclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim. *Id.*

Under the well-pleaded allegations of these complaints, plaintiffs could prove no boycott or coercion. Plaintiffs do not suggest that their pleadings could be amended to cure their deficiencies.

Nor have plaintiffs come forward with specific facts which raise a triable issue as to boycott or coercion. And this is true though plaintiffs in their capacity as state regulators conducted lengthy investiga-

(1st Cir.1989) ("Coercion [under the McCarran Act] has not generally been interpreted to include situations where options have not been entirely closed off to the allegedly coerced parties, even though such options may have been made more expensive"). To hold otherwise would be somewhat ironic, for it is the McCarran Act that allows the insurance industry, in-

cluding defendants, to provide through ISO the support functions which plaintiffs regard as critical; it makes little sense then to impose antitrust liability on defendants, who are permitted by the McCarran Act to agree to provide the support, for agreeing to discontinue it as to a policy form no longer in use.

tions under their regulatory laws which gave them extensive access to the files and records at least of the domestic defendants as well as to other sources of relevant information. Plaintiffs have been given the opportunity also to conduct relevant discovery and have not suggested that they needed discovery to be able fairly to meet this motion.

Accordingly, all defendants are entitled to dismissal of the complaints without leave to amend, or in the alternative summary judgment (considering defendants' submissions outside the pleadings), on all federal law claims in the various complaints. In addition all defendants are entitled to judgment on the Sixth and Seventh Claims of the First Wave Complaints and the Fourth and Sixth Claims of the Second Wave Complaints for failure to allege boycott, coercion, or intimidation. *See Freier v. New York Life Ins. Co.*, 679 F.2d 780, 783 (9th Cir.1982).

The foreign reinsurer defendants named in the Fifth, Sixth, and Eighth Claims of the First Wave Complaints and the Third, Fourth, and Fifth Claims of the Second Wave Complaints have joined in this motion as an alternate ground for dismissal. They have also made a motion to dismiss on the ground of international comity which the Court grants. (*See infra* § V.E(3).) Because that motion rests on the proposition that those defendants are not subject to the antitrust laws, it raises the question whether, as a result, they also are not subject to state regulation to a degree sufficient to be entitled to McCarran Act immunity. It does not appear necessary to resolve that issue here, however; if the dismissal on comity grounds is sustained, the alternative ground for dismissal under the McCarran Act will be moot. Conversely, if it is not sustained, it will be because American regulatory laws apply to them and hence the McCarran Act as well.

## B. STATE ACTION IMMUNITY, STATUTORY INTERPRETATION, AND CAUSATION

Defendants have moved for summary judgment with respect to those claims which "relate to the collective form-making process in those states that took action to approve, disapprove or withhold approval of the revised ISO CGL forms." (Def. Memo. 1.) This motion, therefore, is limited in its scope; it does not reach conduct outside of the collective activities to revise the CGL policy forms and it does not apply to plaintiff states, or plaintiffs in states, that do not have a procedure for approval, disapproval, or withholding approval of policy forms, namely Alaska, California, Colorado, and Montana. Because plaintiffs' opposition memorandum either misconceives or ignores the narrow scope of this motion, its arguments are in large part irrelevant.

### (1) *State Action Immunity*

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1934), the Supreme Court held that the Sherman Act was not intended to prohibit states from imposing restraints on competition. The circumstances under which this state action immunity extends to private parties were defined in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980): "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy,' and, second, the State 'must supervise actively any private anticompetitive conduct.'" 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (Brennan, J.)).

### (a) *State Policy*

There is no question that all of the states have clearly articulated and affirmatively expressed policies permitting collective policy form development activities. Each of the states has licensed ISO and its members to engage in certain collective activities, including filing of rates and policy forms and developing policy forms.

These actions are governed by *Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). There the Supreme Court applied state action immunity to collective rate making activities under state

laws permitting—but not requiring—motor carriers to agree on rates subject to the supervision of the state public service commission having authority to accept, reject, or modify the agreed rates. The same situation is presented here. The states have authorized the insurers to agree on policy forms subject to the supervisory authority of the insurance regulators. Most of the states require regulatory approval before a form may be used; others permit a form to be used unless or until the regulators disapprove it. (Def.Memo. 5–6.) And here, as in *Southern Motor Carriers Rate Conference,* insurers were not required to participate in the collective activities of ISO and were free to use policies other than those developed and sponsored by ISO.

Plaintiffs argue that the states have authorized only voluntary joint action, not coercion or boycotts. But the fact that the states prohibit coercion and boycotts does not diminish the immunity flowing from the authority to conduct collective policy development activities. That immunity depends on the presence of active state supervision, as discussed below, and the states' prohibition of coercion and boycott is simply one aspect of this supervision. To argue that the presence of such state law prohibitions nullifies the state action immunity would be to turn the doctrine on its head. The premise of that doctrine is that it immunizes conduct that might otherwise run afoul of the antitrust laws. It does so "to resolve conflicts that may arise between principles of federalism and the goal of the antitrust laws, unfettered competition in the marketplace." *Southern Motor Carriers Rate Conference,* 471 U.S. at 61, 105 S.Ct. at 1729. It achieves that end by allowing states "to adopt policies that permit, but do not compel, anticompetitive conduct by regulated private parties." *Id.* at 66, 105 S.Ct. at 1731. Under the regulatory schemes of the relevant states, insurers are permitted to engage in collective policy development but are not required to do so or to adopt the collectively produced policies; activities directed to an insurer's individual decision what coverage to offer, as distinct from what terms to include in

ISO policy forms, are not claimed to be covered by state action immunity and are not addressed by this motion.

Plaintiffs' reliance on *Medic Air Corp. v. Air Ambulance Authority,* 843 F.2d 1187 (9th Cir.1988), is misplaced. That case held that defendant did not, by reason of having been designated by the state as an exclusive ambulance dispatcher, become immune against a claim that it had restrained competition in the market for air ambulance services. The immunity which attached to dispatch services did not extend to activities in the separate and distinct market for ambulance services. But that reasoning does not apply where, as here, the restraint complained of occurred (though not exclusively) in the course of the protected conduct, i.e. the collective development of terms for policies to be issued by the participating insurers, which was exactly what the states permitted to be done.

### (b) State Supervision

State action immunity applies only where the state actively supervises "to ensure that [it] will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies." *Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). Plaintiffs argue that state supervision in this case does not reach the restraints alleged, i.e., "the agreements and acts to limit or eliminate the availability of consumer-demanded coverages." (Unified Opp. 58.) But in *Patrick,* the Court specifically referred to the state public service commission's "ultimate authority and control over all intrastate rates" in *Southern Motor Carriers Rate Conference* as an example of what constitutes active supervision. *Id.* (quoting *Southern Motor Carriers Rate Conference,* 471 U.S. at 51, 105 S.Ct. at 1723). As noted above, there, as here, supervision took the form of approval, disapproval, or modification of the end product of the collective action. That degree of supervision was sufficient protection of the public interest, without the necessity of additional supervision of the manner in which the

participants conducted the collective process.

Plaintiffs contend that, even if the state action immunity otherwise applied, its application here is barred by the McCarran Act which, they contend, specifically reserves application of the Sherman Act to boycott and coercion. *Cf. Ballard v. Blue Shield of Southern W. Va., Inc.,* 543 F.2d 1075, 1078–79 (4th Cir.1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977). The two immunity doctrines are not congruent and need to be distinguished with care. The McCarran Act, as discussed in section V.A., *supra,* grants to the insurance business a limited immunity from the antitrust laws, conditioned on a degree of state regulation. State action immunity, as discussed here, permits the states to displace the antitrust laws with respect to specified activities actively supervised by the states. *See generally* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶¶ 210.1b, 212.1f, at 113 (Supp.1988) ("The [Supreme] Court's view of federalism [under *Parker v. Brown* ] has left enormous discretion to the states to displace competition."). Plaintiffs' contention was most recently addressed and rejected in *Health Care Equalization Committee v. Iowa Medical Society,* 851 F.2d 1020, 1027 n. 10 (8th Cir.1988), where the court stated that it would be anomalous to hold that Congress, by adopting the McCarran Act, intended to subject insurance companies to antitrust liability for actions that would be exempt if engaged in by others.

The state action immunity motion must therefore be granted.

#### (2) *Statutory Interpretation*

Defendants also contend that because the effects complained of resulted from the actions of the states which approved the use of the revised policy forms, there could have been no restraint of trade. Their reliance on *In re Airport Car Rental Antitrust Litigation,* 521 F.Supp. 568 (N.D.Cal. 1981), *aff'd.,* 693 F.2d 84 (9th Cir.1982), *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983), is, however, misplaced. The restraint complained of in that case flowed from the decision of airport authorities not to lease space to plaintiffs. The fact that that decision may have been influenced by a conspiracy among defendants did not make the defendants responsible for the airport authorities' independent exercise of judgment to exclude plaintiffs. In the instant actions, however, the restraints complained of did not flow from the actions of state regulators who approved or disapproved policy forms; they flowed from the collective actions of defendants by which they allegedly sought to bring about the use of policy forms that restricted available insurance coverage. To the extent that their conduct is not immune from antitrust scrutiny, defendants would be responsible for its consequences.

Defendants also argue that plaintiffs cannot demonstrate the existence of a restraint in the policy form development process. (Reply 1–10.) The argument seems to rest on confusion between Sherman Act liability and the effect of the McCarran Act. There is little question that, in the absence of McCarran Act immunity, allegations of collective action by defendants to bring about reduced coverage for purchasers of insurance would state a claim under Section 1:

> There is no doubt that the members of such [trade] associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm. Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products. Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny.

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 1937, 100 L.Ed.2d 497 (1988). It would not matter for purposes of Section 1 that, as defendants argue, the collective action of defendants did not limit an individual insurer's ability to offer broader coverage. (Reply 5.) The individual insurer's continued freedom is relevant only to application of Section 1013(b) of the McCarran Act, the

boycott exclusion, not to liability for anticompetitive agreements.

The motion based on statutory interpretation must therefore be denied.

### (3) *Causation*

The foregoing analysis also disposes of defendants' contention that plaintiffs were not injured "by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). No states required insurers to adopt the approved forms. Hence, injury flowing from prohibited collective action to coerce competitors to restrict coverage or deny consumers access to insurance coverage, unless otherwise immune, would fall within Section 4 of the Clayton Act.

There being no disputed issues of fact material to the disposition of this motion, and for the reasons stated, defendants' motion for summary judgment on all claims based on defendants' participation in the collective policy development process asserted by states, and plaintiffs in states, other than Alaska, California, Colorado, and Montana must be granted on the ground of state action immunity, but will otherwise be denied.

### C. STANDING

The domestic and foreign reinsurer defendants [21] have moved to dismiss the complaints against them on the ground that plaintiffs do not have standing to complain of actions taken in the reinsurance and retrocessional insurance markets.[22]

The reinsurer defendants characterize the complaints as alleging three distinct insurance markets: primary insurance, reinsurance, and retrocessional insurance. They contend that plaintiffs claim to have participated only in the primary insurance market and that the defendant reinsurers are alleged to have conspired only in the reinsurance and retrocessional insurance markets. On this basis, defendants contend that plaintiffs do not claim to have been directly affected by the alleged conduct of these defendants and that, therefore, plaintiffs do not have standing to assert the antitrust claims pleaded.

█ To have standing to assert an antitrust claim, a plaintiff must allege that it has suffered harm as a direct result of the defendant's conduct and that this harm is within the scope of the protection of the antitrust laws. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 478, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). Accepting, as the Court must, the allegations of the complaint, they establish that the terms and availability of reinsurance directly affect the availability of insurance coverage to consumers. As discussed in section V.A(1), *supra*, plaintiffs' contention is that the reinsurers' alleged conspiracy to eliminate reinsurance for certain CGL coverages "led inexorably to an injury ... in the interrelated primary insurance market."

The claims against these defendants therefore fall within the analysis in *McCready*, in which a Blue Cross subscriber was found to have standing to challenge an alleged conspiracy between Blue Cross and psychiatrists to deny reimbursement of psychologists' services. Though the restraint occurred in a market (the market for psychiatrists' services) in which plaintiff was not a consumer, the Court reasoned that plaintiff had standing:

> McCready claims that she has been the victim of a concerted refusal to pay on the part of Blue Shield, motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers. Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely

---

**21.** All defendants other than ISO, INA, Hartford, Allstate, Aetna, and CIGNA.

**22.** This motion does not include the claims against Merrett and Three Quays alleging an agreement in restraint of trade in the excess and umbrella insurance market.

" 'the type of loss that the claimed violations ... would be likely to cause.' " 457 U.S. at 479, 102 S.Ct. at 2548 (citations omitted). And that was true even though plaintiff's plan coverage was purchased and paid for by her employer; as a consumer of psychotherapy services, she nevertheless was within the area of the economy threatened by a breakdown of competitive conditions resulting from Blue Cross's refusal to reimburse for services she desired.

Plaintiffs' allegations suffice to establish agreements the direct effect of which, if true, would be to restrain the availability of desired coverages in the markets in which plaintiffs purchase insurance. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), is distinguishable. There the plaintiff unions complained of a conspiracy by defendants to abrogate or weaken the collective bargaining relationship between the unions and employers. As the Court there observed, "the Union was neither a consumer nor a competitor in the market in which trade was restrained." *Id.* at 539, 103 S.Ct. at 909. And it was "not clear" whether the Union's interests would be served or disserved by enhanced competition in that market. Moreover, the claim of causation between the Union's injury and the alleged restraint contained "somewhat vaguely defined links." *Id.* at 540, 103 S.Ct. at 909.

On the face of the allegations, plaintiffs have standing. The motion based on lack of standing must be denied.

### D. GLOBAL CONSPIRACY CLAIM

Foreign reinsurer defendants have moved to dismiss the First Claim of the Second Wave Complaints, the so-called global conspiracy claim. That claim alleges that all defendants, including the moving defendants, engaged in a conspiracy to restrain the market for CGL property and casualty risks and for reinsurance and retrocessional reinsurance by agreeing to limit or eliminate occurrence, pollution, retroactive, and long-tail coverage, which are the subjects of the allegations of the complaints. In other words, this claim links all of the various specific claims of wrong-doing by various groups of defendants in various markets to allege one global conspiracy among all defendants.

The moving defendants are foreign reinsurers doing business in London. They are named in the Second, Third, and Sixth claims of the Second Wave Complaints in connection with discrete conspiracy claims. They make this motion on the ground that the First Claim merely lumps together the separate conspiracies elsewhere alleged without any allegation indicating how the separate conspiracies became a single global conspiracy. (Def.Memo. 4.) No question is raised as to the sufficiency of the pleading of the discrete conspiracies in the other claims.

Plaintiffs respond that the complaints "allege that all of the defendants were conspirators who intended to prevent the States from obtaining consumer-demanded insurance coverages." (Unified Opp. 106.) Plaintiffs' theory is that because "the conspiracies alleged are linked by a common purpose, by overlapping defendants and by interconnected acts," a jury could find a single global conspiracy among all the participants in the separate conspiracies. (*Id.* at 109–10.)

A conspiracy is a combination of two or more persons acting in concert to accomplish a common unlawful purpose. A coconspirator need not know the identity of all other conspirators or the full extent of the conspiracy. *E.g., United States v. Metropolitan Enterprises, Inc.,* 728 F.2d 444, 450–51 (10th Cir.1984). But there must be a common agreement and understanding. Mere identity of purpose, interconnected events, and shared participants, on which plaintiffs base their claim, do not link separate conspiracies into one overall, single conspiracy. (*See* Unified Opp. 110–12.) For separate activities to result in a single conspiracy, the allegations and proof must reflect a wheel and spoke arrangement in which a single person at the hub implements the conspiracy by a series of arrangements with others to carry out the purpose of their conspiracy. *See, e.g.,*

*United States v. Levine,* 546 F.2d 658, 662–63 (5th Cir.1977). But such separate activities, even if for a common purpose, do not constitute a conspiracy "without the rim of the wheel to enclose the spokes." *Kotteakos v. United States,* 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). There must be a connection among all the alleged participants sufficient to support a finding that they had entered into the alleged conspiracy. *Id.* at 754, 66 S.Ct. at 1242. *See also Pinhas v. Summit Health, Ltd.,* 880 F.2d 1108 (9th Cir.1989) ("Pinhas alleges ... that as a result of his refusal to sign the 'sham' contract, appellees entered into *a* conspiracy ... to suspend and terminate his medical staff privileges ... and to have the report of his termination disseminated....") (emphasis added).

Plaintiffs have made no attempt to show the existence of such a connection to support a finding of a single overall conspiracy, and the allegations of the complaint would not permit proof of one. They allege a number of different conspiracies having different members and different subject matter. For example, the Fifth Claim of the Second Wave Complaints charges some defendants, some of whom are not named elsewhere, with having conspired to restrict the terms under which property insurance and reinsurance would be provided for North American risks. Property insurance has not been alleged to have a connection with CGL insurance or with the market in which CGL insurance is sold. Thus, if all of the facts alleged in the complaint were proved at trial, a conspiracy verdict against these defendants under the First Claim could not stand. The motion of these defendants to dismiss the First Claim

of the Second Wave Complaints must therefore be granted.[23]

## E. SUBJECT MATTER JURISDICTION AND COMITY

The defendants named in the Sixth and Eighth Claims of the First Wave Complaints and the Fourth and Fifth Claims of the Second Wave Complaints[24] have moved to dismiss those claims for lack of subject matter jurisdiction or on the basis of international comity.[25] The motion is based on the Foreign Trade Antitrust Improvements Act of 1982, Pub.L. No. 97–290, 96 Stat. 1246 ("FTAIA"), and on the doctrine of international comity as stated in *Timberlane Lumber Co. v. Bank of America.*[26]

The following allegations are relevant:

In the Fifth Claim, plaintiffs allege that the defendant London reinsurers agreed to restrict the terms on which reinsurance would be written and to refuse to reinsure risks written on the occurrence form or "long-tail" risks. They allege agreements among defendants, coercion and intimidation of primary insurers to use the claims-made form and reject the occurrence form, and coercion and intimidation of individuals who might communicate with regulatory bodies. (Conn.Compl't ¶¶ 91, 93, 127–128; Cal.Compl't ¶¶ 87, 89, 133–134.) As a result, it is alleged that occurrence liability has become unavailable for many risks and the price of such coverage has increased. (Conn.Compl't ¶ 129; Cal. Compl't ¶ 135.)

In the Sixth Claim, plaintiffs allege that, at a meeting in London, the defendant London reinsurers and one reinsurance broker agreed that all North American casualty reinsurance treaties would be written with

**23.** At the hearing, the remaining defendants joined in this motion. No objection having been made, this claim will be dismissed against all defendants.

**24.** These claims will be referred to collectively as the Sixth Claim and the Eighth Claim, respectively.

**25.** At the hearing these defendants asked that their motion be treated as encompassing also the Fifth Claim of the First Wave Complaints and the Third Claim of the Second Wave Com-

plaints (collectively referred to as the Fifth Claim). No objections having been made, the issues having been fully briefed, and in the absence of prejudice to plaintiffs, this request is granted.

**26.** *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 614 (9th Cir.1976) ("*Timberlane I*"), *on remand,* 574 F.Supp. 1453 (N.D.Cal.1983), *aff'd,* 749 F.2d 1378 (9th Cir. 1984) ("*Timberlane II*"), *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985).

a pollution exclusion (Conn.Compl't ¶ 99; Cal. Compl't ¶ 95) lessening the availability and affordability of pollution liability coverage from primary insurers throughout the United States (Conn.Compl't ¶ 97; Cal. Compl't ¶ 93).

In the Eighth Claim, plaintiffs allege that a group of London retrocessional reinsurers, including the seven named defendants, agreed in 1987 to boycott retrocessional reinsurance treaties which included coverage for North American property risks, unless the original insurance coverage contained a seepage, pollution, and contamination exclusion clause. (Conn.Compl't ¶ 138(b); Cal.Compl't ¶ 149(b).) As a result, seepage and pollution coverage has been excluded from policies on American risks, and prices for such coverage have been increased. (Conn.Compl't ¶ 139; Cal. Compl't ¶ 150.)

### (1) *The Factual Background*

The London insurance markets in which the defendants named in the Fifth, Sixth, and Eighth Claims conduct their reinsurance and retrocessional reinsurance business are composed of underwriters at Lloyd's of London, other London insurance firms ("London Company Market" firms), and brokers who obtain coverage in these markets. *See, e.g., Edinburgh Assurance Co. v. R.L. Burns Corp.*, 479 F.Supp. 138, 144 (C.D.Cal.1979), *aff'd in part and rev'd in part on other grounds*, 669 F.2d 1259 (9th Cir.1982); *Syndicate 420 at Lloyd's, London v. Early American Ins. Co.*, 796 F.2d 821, 824 (5th Cir.1986); *Travelers Indemnity Co. v. Booker*, 657 F.Supp. 280, 282–83 (D.D.C.1987).

As described in *Edinburgh Assurance*, the purchase and sale of insurance in London takes place on the floor of the underwriting room at Lloyd's and in the offices of individual insurance companies. A Lloyd's or London Company Market agent evaluates and negotiates proposed insurance placements brought by brokers for the consideration of the syndicate of underwriters that the agent represents.[27] 479 F.Supp. at 145. A "slip" (a broker-originated document containing the essential features of the coverage sought) is presented to each underwriter. *Id.* Because many risks are too large to be insured by just one London market participant, the broker circulates the slip among numerous underwriting agents, each of whom makes the individual decision whether to underwrite a portion of the risk. *See id.* Because the spreading of large risks in the London reinsurance and retrocessional insurance markets necessarily requires numerous subscribers (*see* Conn.Compl't ¶ 4(w); Cal. Compl't ¶ 28), negotiations over the terms and conditions on which risks will be accepted and insured are integral to the functioning of the market. Underwriters negotiate with brokers over the terms on which they are willing to accept a risk. Because different underwriters may be willing to accept a particular risk on different terms, brokers and underwriters may have to negotiate mutually agreeable terms and conditions on which that risk will be accepted. *See Edinburgh Assurance*, 479 F.Supp. at 145.

The sequence of insurance transactions resulting in the purchase of reinsurance and retrocessional reinsurance in the London markets begins with the purchase of primary insurance by the consumer. The primary insurer in the United States may then elect to reinsure some portion of the portfolio of risks it has underwritten. (Conn.Compl't ¶ 4(p); Cal.Compl't ¶ 26.) The form of reinsurance most pertinent to these cases is known as "treaty" reinsurance (Cal.Compl't ¶ 27), in which the reinsurance company agrees in advance to indemnify a primary insurance company for a defined portion of the risks to be assumed by the primary carrier during the treaty period (Conn.Compl't ¶ 4(w); Cal. Compl't ¶¶ 4(p), 27). As a participant in a reinsurance treaty, a reinsurer does not deal directly with primary insurance consumers or individual risks and may never

---

**27.** Underwriters at Lloyd's must be individuals trading for their own accounts. However, underwriters band together into syndicates represented by one or more underwriting agents.

Department of the Treasury, Report to Congress on the Taxation of Income Earned by Members of Insurance or Reinsurance Syndicates 5–6 (February, 1989).

know the identity of individual risks within the portfolio of risks included in the treaty. *See Excess and Casualty Reinsurance Ass'n v. Ins. Comm'r,* 656 F.2d 491, 492, 495 (9th Cir.1981); *American Re-Insurance Co. v. Insurance Comm'r,* 527 F.Supp. 444, 453 (C.D.Cal.1981). When the primary insurer seeks reinsurance coverage in the London market, one of several reinsurance centers, it initiates the type of reinsurance transaction which is the subject of the Sixth Claim.

Reinsurers also purchase reinsurance. This step in the sequence of reinsurance transactions, and the one which is the subject of the Eighth Claim, may occur in the London market for retrocessional reinsurance. Retrocessional reinsurance means reinsurance of the business written by reinsurers. (*See also* Conn.Compl't ¶ 4(r); Cal. Compl't ¶ 107.) Plaintiffs' Eighth Claim refers to the so-called LMX market which consists of those retrocessional reinsurers who specialize in providing retrocessional reinsurance for Lloyd's of London and the London Company Market firms. (Conn. Compl't ¶ 111; Cal.Compl't ¶ 107.) At this level, the purchaser of retrocessional reinsurance is a Lloyd's or London Company Market reinsurer.

### (2) *Subject Matter Jurisdiction*

 By virtue of the FTAIA, the Sherman Act does "not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations ..." unless that conduct has a "direct, substantial, and reasonably foreseeable effect" on commerce within the United States, import trade into the United States, or export trade engaged in by a person within the United States. 15 U.S.C. § 6a.

Plaintiffs contend that the conduct alleged involved agreements to restrain the provision of reinsurance for American risks, and hence the import into the United States of insurance services. These allegations are sufficient to invoke the import exception of the FTAIA.

Defendants contend that the FTAIA applies nevertheless because the conduct complained of in these claims is wholly foreign commerce. The subject matter of the alleged agreement, however, concerned the provision of reinsurance within the United States, and the allegations of effects in United States markets are sufficient to preclude a characterization of wholly foreign commerce.

The First Wave Complaints allege that the London market is one of the three principal markets for the supply of reinsurance (Cal.Compl't ¶ 29), and all complaints allege that the agreements made in the London market had the effect of limiting the ability of primary insurers to obtain reinsurance except on certain terms, and for a higher price (Conn.Compl't ¶¶ 97, 100, 134, 139; Cal.Compl't ¶¶ 138, 140, 148, 150). The complaints further allege that the availability of primary coverage hinges on the primary insurers' ability to obtain reinsurance of risks (Conn.Compl't ¶ 4(p); Cal. Compl't ¶ 34), and that the availability of reinsurance hinges on the availability of retrocessional reinsurance (Conn.Compl't ¶¶ 110, 114; *see* Cal.Compl't ¶ 150). Thus, plaintiffs have adequately alleged that a decision not to provide reinsurance or retrocessional reinsurance to cover certain types of risks in the United States has a direct effect on the availability of primary insurance in the United States. *Cf. McGlinchy v. Shell Oil Co.,* 845 F.2d 802, 815 (9th Cir.1988) (no direct, substantial, and reasonably foreseeable effect on United States commerce where agreements involved orders for products in South East Asia and other areas outside the United States). Therefore, the FTAIA does not apply.

Where the FTAIA does not apply, the Court must determine whether it has subject matter jurisdiction under the analysis in *Timberlane I:* (1) whether the alleged restraint affected or was intended to affect the foreign commerce of the United States, and (2) whether it is a cognizable violation of the Sherman Act.[28] 549 F.2d at 615. The allegations that establish a direct effect in the United States are sufficient to

---

**28.** There is some uncertainty whether the *Timberlane* analysis for extraterritorial application of the antitrust laws has been superseded by the FTAIA. It is arguable that the FTAIA codifies the standard for determining whether there is extraterritorial jurisdiction for all cases, not

establish this Court's subject matter jurisdiction under *Timberlane I.*

### (3) *International Comity*

■ Regardless of whether subject matter jurisdiction exists, this Court may determine that its jurisdiction under the antitrust laws should not be exercised on the ground of international comity. *See Timberlane I,* 549 F.2d at 613–14.[29] This issue is properly raised and disposed of by a Rule 12(b)(1) motion so long as the merits of plaintiffs' antitrust claims are not reached. *Timberlane II,* 749 F.2d at 1382.

*Timberlane I* established a rule of reason controlling the extraterritorial application of the antitrust laws. It requires an analysis of whether, as a matter of international comity and fairness, extraterritorial jurisdiction should be asserted. *Timberlane I,* 549 F.2d at 615.

This analysis is governed by seven factors:

> [T]he degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compli-

ance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States compared with conduct abroad.

*Id.* at 614. Each of these seven factors, discussed below, must be balanced in every case. *Timberlane II,* 749 F.2d at 1383 n. 3; *see also Star–Kist Foods, Inc. v. P.J. Rhodes & Co.,* 769 F.2d 1393, 1395 (9th Cir.1985) (applying *Timberlane* factors to extraterritorial application of the Lanham Act); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 428–29 (9th Cir. 1977) (same). The object of this analysis is to determine whether "the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction." *Timberlane I,* 549 F.2d at 614–15.[30]

### (a) *Degree of Conflict With Foreign Law or Policy*

The London reinsurance and retrocessional reinsurance business, the subject of

---

29. The legislative history of the FTAIA states that "[i]f a court determines that the requirements for subject matter jurisdiction are met, this bill would have no effect on the courts' ability to employ notions of comity, *see, e.g., Timberlane Lumber Co. v. Bank of America,* 549 F.2d 1287 (3rd Cir.1979) [sic]." H.R.Rep. No. 97–686 at 13 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 2431, 2487, 2498.

30. *Timberlane* has been criticized for requiring courts to balance American and foreign interests which they are not equipped or qualified to do. *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 948–50 (D.C.Cir. 1984) (substantial limits on court's ability to conduct balancing); Aldisert, *Federal Courts and Extraterritorial Antitrust Law: Enlightened Self Interest or Yankee Imperialism?,* 5 J.L. & Com. 415, 419–20, 426–29 (1985) (courts unaccustomed to evaluating interests of other nations); Note, *Forum Non Conveniens and the Extraterritorial Application of United States Antitrust Law,* 94 Yale L.J. 1693 (1985) (courts poorly equipped). Its authority in this circuit, however, remains unimpaired.

---

only for those cases involving non-import trade. *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 236, at 235 (Supp.1988) ("The most interesting question about the new statute is whether its standard for appraising export restraints differs from that for appraising import restraints or whether it merely 'codifies' a general understanding of when American antitrust should be concerned about restraints abroad that might affect United States interests only indirectly, insubstantially, or unforeseeably."); Hawk, *International Antitrust Policy and the 1982 Acts: The Continuing Need for Reassessment,* 51 Fordham L.Rev. 201, 222 (1982) ("[i]t is ... not clear whether the specific effect test set forth in the Act is limited to determining whether export transactions of purely foreign transactions have the requisite effect on United States trade. The test might also be used in determining whether *import* transactions ... have the requisite effect on United States trade.") See also the dictum in *McGlinchy,* 845 F.2d at 813 n. 8, that the FTAIA was passed "[i]n an effort to provide a single standard for the issue of extraterritorial application of the Sherman Act." In that case, however, the FTAIA clearly applied because export and foreign transactions were involved.

Until there is a clearer indication that *Timberlane I* no longer controls, however, this Court must follow it.

these claims, takes place in a regulatory and competitive framework established by the British government. In 1870, Parliament, by the Lloyd's Act, established the Society of Lloyd's and empowered it to regulate the marketplace composed of its members. The Lloyd's governing body continues to be empowered to exercise quasi-governmental authority in regulating the activities of its members. Lloyd's Acts, 1870–1982. The London Company Market companies are incorporated in the United Kingdom in accordance with the Companies Act, 1985, are regulated by the Insurance Companies Act, 1982, and associated regulations, and are supervised by the British Department of Trade and Industry. Agreements among British insurers, reinsurers, and retrocessional reinsurers (including both Lloyd's and London Company Market underwriters) relating to the provision of insurance services are expressly exempted from British regulation of anticompetitive agreements. *See* Restrictive Trade Practices (Services) Order 1976, S.I. 1976 No. 98, Schedule ¶ 8.

Plaintiffs argue that, because the Treaty of Rome of 1957, which governs trade regulation in the European Economic Community, is part of the law of England, *In re Westinghouse Uranium Contract* [1978] A.C. 547, 564, there is no conflict with English law or policy. Article 85 of the treaty prohibits

> all agreements ... and concerted practices ... which have as their object and effect the prevention, *restriction* or distortion *of competition within the common market* and in particular those which: (a) ... fix purchase or selling prices or any other trading condition; [or] (b) limit or control production, markets, technical development, or investments....

(Emphasis added.) Article 85 has been held to outlaw restrictive practices in the insurance industry notwithstanding its regulation by the state in which it is located. *Verband der Sachversicherer eV v. E.C. Commission*, 4 Common Mkt.Rep. (CCH) 264 (1988). Article 85, plaintiffs contend,

establishes that enforcement of American antitrust law is consistent with applicable foreign law.

It seems doubtful, however, that this Article would be applied to outlaw long-standing practices in the London reinsurance market, openly conducted in conformity with English law. Moreover, the Treaty of Rome by its terms applies only to trade between member states, not to trade with a non-member such as the United States, and Article 85 applies only to restriction of competition within the common market.

With respect to the relevant United States–English trade, the evidence of conflict between the antitrust laws and English law and policy is substantial. English courts have repeatedly expressed unmitigated hostility to the extraterritorial application of American antitrust laws. *See In re Westinghouse Uranium Contract*, 1978 A.C. 547, 591 (counsel for the government), 616 (Judgement of Lord Wilberforce), 639 (Judgement of Lord Diplock), 650 (Judgement of Lord Fraser of Tullybelton); *British Nylon Spinners, Ltd. v. Imperial Chemical Industries, Ltd.*, [1952] 2 All E.R. 780 (CA), (LEXIS, Enggen library, Cases file at 10) (Judgement of Sir Evershed, M.R.). *See also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 946 (D.C.Cir.1984).

An English "blocking" statute restricts the availability of evidence and production of documents for use in judicial proceedings in the United States. Protection of Trading Interests Act, 1980, ch. 11, § 2, *reprinted in* Antitrust & Trade Reg.Rep. (BNA) No. 959, at F–1; *see* Note, *Power to Reverse Foreign Judgments: The British Clawback Statute Under International Law*, 81 Colum.L.Rev. 1097, 1106–09 (1981) (describing the blocking provision of the Protection of Trading Interests Act). The Protection of Trading Interests Act provides a remedy to English antitrust defendants to recover from plaintiffs the punitive portion of a foreign multiple damage judgment against them where the foreign judgment concerns activities outside the en-

forcing nation's territory.[31] Protection of Trading Interests Act, *supra*, at § 6; *see* Note, 81 Colum.L.Rev. at 1109–13 (describing section 6 of the Act). This Act has been applied several times notwithstanding the Treaty of Rome. *See* Cira, *The Challenge of Foreign Laws to Block American Antitrust Actions*, 18 Stan. J. Int'l L. 247, 251–52 & n. 29 (1982) (between its passage and 1982, the Act applied to issuance of directives barring compliance with American orders, some of which involved U.K. subsidiaries of U.S. parents).

On balance, the Court concludes that enforcement of the antitrust laws against activities in the London reinsurance market would lead to significant conflict with English law and policy. This conflict, unless outweighed by other factors in the comity analysis, is itself a sufficient reason to decline exercise of jurisdiction. *Timberlane II*, 749 F.2d at 1384.

#### (b) The Nationality or Allegiance of the Parties and the Locations of Principal Places of Business of Corporations

All plaintiffs are located in the United States. Although all defendants named in the Fifth, Sixth, and Eighth Claims are located in England and are of English nationality, many of the corporate defendants are subsidiaries of American corporations and may be influenced by the allegiance of their American parents.[32] But it is also true that adjudication of this claim would require the testimony of witnesses and the production and analysis of documents located in England. *See Timberlane II*, 749 F.2d at 1384; *Star–Kist*, 769 F.2d at 1396.

On balance this factor weighs against the exercise of jurisdiction.

#### (c) The Extent to Which Enforcement by Either State Can Be Expected to Achieve Compliance

A number of barriers stand in the way of enforcement of any judgment against these defendants by English courts. Those courts have previously refused to aid in the enforcement of the judgment of an American court where that court had exercised what the English court considered unlawful extraterritorial jurisdiction. *See British Nylon Spinners, Ltd. v. Imperial Chemical Industries, Ltd.*, 1 Ch. 19 (1953); 1 Ch. 37 (1955); *see also* the discussion at section V.E.(3)(b), *supra*.

Plaintiffs could collect a judgment by enforcing it against such assets of defendants as may be found in the United States. But it is improbable that there could be enforcement of the requested injunctive relief against activities in London. Indeed, the Protection of Trading Interests Act allows the British Secretary of State for Industry to forbid British nationals from complying with foreign antitrust judgments. Protection of Trading Interests Act, *supra*, at § 1; *see* Note, 81 Colum.L.Rev. at 1104–06.

Thus this factor tips slightly against the exercise of jurisdiction.

#### (d) The Relative Significance of Effects on the United States as Compared With Those Elsewhere

This factor requires a comparison of the effect of the alleged illegal conduct on the commerce of the United States with its effect abroad. *Timberlane II*, 749 F.2d at 1384.

Plaintiffs allege that half of the reinsurance business covers North American risks. (Conn.Compl't ¶ 4(h); Cal.Compl't

---

**31.** This ("clawback") provision was aimed at the "pernicious extraterritorial effect doctrine" of American antitrust law. 973 Parl.Deb., H.C. (5th Series) 1535 (1979). It also reflects a view that multiple damages are penal and should be imposed only in proceedings incorporating the protections of criminal proceedings. *See* Note, 81 Colum.L.Rev. at 1103–04.

**32.** Note that England, however, does not recognize the extraterritorial application of the laws

of the parent corporation's state based on the parent's control of the subsidiary. Note, 81 Colum.L.Rev. at 1100–01. English authorities, moreover, take the position that, in any event, the laws and policies of the territorial state must be accorded primacy. *See* Griffin, *Possible Resolutions of International Disputes Over Enforcement of U.S. Antitrust Law*, 18 Stan. J. Int'l L. 279, 286 (1982).

¶ 4(t).) There are no allegations showing what percentage of those risks involved reinsurance for CGL policies covering risks within the United States. And there are no allegations with respect to the relative effects of retrocessional reinsurance agreements. It is clear, however, that the conduct of defendants had a sufficiently significant effect in the United States to make this factor weigh in favor of the exercise of jurisdiction.

### (e) The Extent to Which There is Explicit Purpose to Harm or Affect United States Commerce

As in *Timberlane II,* the conduct of defendants complained of in these claims was directed primarily at reducing their exposure to certain risks and controlling losses, a legitimate business purpose. Their actions (as described in section V.E(1) *supra* ) were "consistent with [local] customs and practices." *Timberlane II,* 749 F.2d at 1385. The allegations of the complaints that defendants' purpose was to restrict the availability of certain types of CGL coverage (Conn.Compl't ¶¶ 132, 137; Cal. Compl't ¶¶ 138, 148) is not inconsistent with the existence of a legitimate business purpose for their actions.

This factor, therefore, weighs against the exercise of jurisdiction.

### (f) Foreseeability of Such Effect

Defendants concede that the factor of foreseeability of the effect in the United States of their conduct weighs in favor of the exercise of jurisdiction. (Def.Memo. 23.)

### (g) The Relative Importance to the Violation Charged of Conduct Within the United States as Compared with Conduct Abroad

The conduct of the defendant reinsurers or retrocessional reinsurers alleged in the Sixth and Eighth Claims is not alleged to have occurred within the United States. Some of the conduct alleged in the Fifth Claim, however, allegedly occured in the United States. Defendants are alleged to have coerced primary insurers and to have communicated with others to bring about rejection of the occurrence form. Thus

relevant conduct occurred within the United States, but its genesis lay in the alleged agreements among the participants in the London market and its purpose was to further those agreements. The alleged activities in the United States are an incident of the market agreement which is the gravamen of the action.

Although the activities within the United States are not insignificant, their significance derives from the alleged foreign agreements. In those circumstances, this factor must be considered as neutral.

### (h) Conclusion

The foregoing analysis leads to the conclusion that the conflict with English law and policy which would result from the extra-territorial application of the antitrust laws in this case is not outweighed by other factors. Although the conduct complained of had effects within the United States, it is not alleged to have excluded competitors from markets or denied consumers access to markets, and it is not alleged to have occurred for that purpose.

The pendent state law claims assert claims similar to those arising under the federal antitrust laws. To the extent that they are based on the conduct alleged in the Fifth, Sixth, and Eighth Claims, they should be dismissed for the same reasons. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 727, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Salveson v. Western States Bankcard Ass'n,* 731 F.2d 1423, 1430 (9th Cir.1984).

## VI. CONCLUSION

Subsequent to the issuance of this ruling, plaintiffs for the first time asked for leave to amend their complaints. The Court has examined Attachment A to plaintiffs' memorandum to vacate judgment or for leave to amend or permit discovery, setting forth the substance of the proposed amendments. Nothing in that attachment would affect the grounds for the Court's ruling. The plain fact is that plaintiffs seek to recover on a theory that, as heretofore explained at length, will not stand under the law.

For the same reason, plaintiffs' discovery request must be denied. That request is

based on rather unprofessional assertions to the effect that the Court criticized or faulted the states for not producing evidence or taking discovery and on a misrepresentation of the Court's ruling. (Plf. Memo. 12.) The States have conducted investigations into the subject matter of these actions for some two years, with all the investigatory powers available to sovereign governments. They were given the right under the pretrial order to conduct discovery relevant to the issues raised by defendants' motions. They are represented by numerous attorneys expert in the antitrust laws. The Court must conclude that the allegations they made in their complaints and the facts they proffered in opposition to the motions represent their best effort—and nothing indicates the contrary.

The Court's ruling accepts the facts alleged in plaintiffs' complaints and their opposition to the motions, and it rests on those facts. There are no factual disputes material to this ruling, which simply applies the law to those facts.

For the reasons stated, judgment will be entered for all defendants dismissing the federal claims in these actions in accordance with the foregoing ruling. The pendent state claims will be dismissed for lack of subject matter jurisdiction, except as otherwise ordered.

IT IS SO ORDERED.

### APPENDIX

Actions in MDL Docket 767
Insurance Antitrust Litigation